[Cite as *In re L.C.*, 2024-Ohio-283.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

In re L.C., K.C., D.C., N.C., P.M.

Court of Appeals No. L-23-1176

Trial Court No. JC 22289583

**DECISION AND JUDGMENT**

Decided: January 24, 2024

* * * * *

David T. Rudebock, for appellee.

Brianna L. Stephan, for appellant.

* * * * *

**MAYLE, J.**

{¶ 1} Appellant, S.T. ("mother"), appeals the June 26, 2023 judgment of the Lucas County Court of Common Pleas, Juvenile Division, terminating her parental rights and granting permanent custody of her children, L.C. ("child 1"), K.C. Jr. ("child 2"), D.C. ("child 3"), N.C. ("child 4"), and P.M. ("child 5"), to appellee, Lucas County Children Services ("LCCS"). The trial court also terminated the parental rights of the children's

fathers, K.C. Sr. ("father 1") and J.M. ("father 2"), who are not parties to this appeal. For the following reasons, we affirm.

## I. Background and Facts

### A. Complaint and adjudication

{¶ 2} On June 9, 2022, LCCS filed a complaint alleging that child 1, child 2, child 3, child 4, and child 5 were abused, neglected, and dependent. The complaint alleged that the family was involved with LCCS in 2019, when the agency removed the children from the home based on concerns about physical abuse, domestic violence, housing, mental health, and parenting. Mother successfully completed her case plan services, and the children returned home.

{¶ 3} However, in June 2022, LCCS received a referral alleging that the children were neglected due to "severe substance abuse by the parents." The referral claimed that the family was staying at a motel, one of the children slept outside of the motel room in a chair, and the children would beg for food because there was no food in the home. When the LCCS caseworker responded to the motel, she saw that mother had a black eye. Father 1 was in the room, but would not get out of bed or talk to the caseworker. The caseworker reported that child 2, child 4, and child 5 disclosed seeing father 1 "use drugs in tinfoil with a straw that has white substances with the smell of burnt tinfoil." Child 4 also disclosed domestic violence between mother and father 1. Additionally, the children disclosed that they had seen mother use drugs in the past and that they "often go hungry

2.

and had not eaten for the day yet." At an agency staffing meeting the next day, mother admitted that her black eye was from father 1 assaulting her, which happened while child 4 was present. She also admitted to using cocaine and heroin the week before, despite being in treatment.

{¶ 4} The trial court held a shelter care hearing and granted LCCS interim temporary custody of the children.

{¶ 5} At the adjudication hearing, although mother denied the allegations in the referral, she stipulated to findings of neglect and dependency for each child. She also stipulated that LCCS had made reasonable efforts to alleviate the need for the children to be placed outside of the home and that awarding LCCS temporary custody was in the children's best interests. At the time of the hearing, the children were placed together in a foster home and were doing well. The guardian ad litem recommended that LCCS be awarded temporary custody of the children. Consistent with the case plan, the GAL also recommended that mother complete a dual diagnosis assessment, complete a domestic violence survivors' class, complete a parenting class, find and maintain stable housing, submit to urine screens at the request of the caseworker and GAL, and have visitation with the children by agreement of the caseworker and GAL. She also recommended that the children be assessed for counseling and follow all treatment recommendations.

{¶ 6} The magistrate found that the children were neglected and dependent, awarded temporary custody to LCCS, approved the case plan LCCS submitted, and

3.

ordered the parties to comply with the plan. The trial court adopted the magistrate's decision.

### B. Case plan

{¶ 7} On July 8, 2022, LCCS filed a case plan with the goal of reunification, which the trial court approved. The case plan required mother to (1) attend domestic violence survivors' services, once she had "made significant progress in the area of mental health[;]" (2) complete a dual diagnosis assessment and follow any treatment recommendations; (3) complete a parent education program, once she had made "significant progress in the areas of (substance abuse and mental health) [sic];" and (4) obtain and maintain stable housing and a stable source of income. The plan required the children to be assessed for counseling to deal with the trauma they had experienced and follow all treatment recommendations.

{¶ 8} Soon after the adjudication hearing, at her caseworker's suggestion, mother asked to participate in the trial court's drug court program. Overall, mother generally did well and complied with her treatment recommendations. However, according to the drug court's orders, there were also multiple times when mother tested positive for drugs, and she was noncompliant once because she "left recovery housing."

{¶ 9} From the time LCCS opened the case to the time of the permanent custody hearing, the magistrate and trial court found in six separate judgment entries that LCCS had made reasonable efforts to prevent the removal of the children from the home or

4.

return the children to the home. Although the entries did not always specify the efforts LCCS made, some of them noted that the reasonable efforts were "case plan services." Nothing in the record indicates that mother objected to any of those findings.

### C. Permanent custody motion

{¶ 10} On February 3, 2023, LCCS filed its motion for permanent custody. In it, the agency alleged that the children could not be placed with any of the parents in a reasonable time or should not be placed with any of the parents, and that granting the agency permanent custody was in the children's best interests.

{¶ 11} LCCS said that the case plan required mother to successfully complete domestic violence classes, substance abuse treatment, and parenting classes, and obtain and maintain appropriate housing, but mother had not made satisfactory progress toward her goals. Although this was the second time that LCCS had removed the children from mother's custody due, at least in part, to domestic violence issues, mother continued to have contact with father 1, who was the perpetrator of domestic violence against her. Additionally, despite being involved in drug court and attending substance abuse treatment, mother continued to test positive for fentanyl and methamphetamine.

{¶ 12} LCCS claimed that it had not referred mother to parenting or domestic violence classes because she had "not made satisfactory progress with respect to her substance abuse issues." Mother had also failed to obtain suitable housing. At the time, mother was living with maternal grandmother, "who has encouraged the children to lie

5.

about what is going on with their mother to LCCS and the school." The agency said that child 1, child 2, and child 3 were refusing to visit with mother, but she was seeing child 4 and child 5 regularly. The motion also indicated that father 1 refused to meet with the caseworker, continued to use drugs, and was not engaged in services to address his domestic violence or substance abuse issues, and father 2's visits with child 5 were stopped because he made inappropriate comments to her, which led to her sexually acting out after visits. The agency argued that granting it permanent custody was in the children's best interests.

### D. Permanent custody hearing

{¶ 13} On May 19 and June 8, 2023, the trial court held the permanent custody hearing. LCCS presented the testimony of Madison Williams, the family's former ongoing caseworker; J.D., the children's foster mother; and Megan Ward, the guardian ad litem. Mother testified in her own behalf.

### 1. Foster mother's testimony

{¶ 14} Foster mother testified that the children had been in her care since June 2022. Her testimony focused on how each child was doing in the placement. Child 1 was "doing really well" at her home, was "[f]antastic" academically, and got along with her siblings. Child 1 was "very quiet and very shy" when she first came to foster mother's home and tended to act like a parent to the other children, but was "not so

closed off anymore" and allowed foster mother to "take on a parental role * * *." She was also attending counseling to deal with anxiety.

{¶ 15} Child 2 was "doing okay." When he first came to foster mother's home, he was "kind of off the wall, a little bit crazy[,] * * * destructive, [and would] do whatever he wanted to do." Since then, he had joined a football team, lost weight, and made friends. He was now a "more well-respected, very polite, well-mannered young man." Child 2 was attending counseling due to self-harming behavior, but was not actively harming himself. Foster mother said that child 2 "gets along pretty well * * *" with his siblings, and was doing "very well" academically.

{¶ 16} Child 3 was "kind of off the wall, very typical ADHD kid" who only wanted to play video games when he first came to foster mother's home. Now, he was active, played soccer, and made friends. He had "changed into a more respectful, well-mannered kid as well." Child 3 was attending therapy to learn coping skills he could use instead of taking medicine to manage his ADHD. Foster mother described child 3's interactions with his siblings as "very typical." He was also doing "very well" academically.

{¶ 17} When child 4 came to foster mother's home, he was "very off the wall, very destructive, very typical ADHD * * * [and] very anxious." Since then, child 4 had "leveled out." He made friends at school and started playing football. He was also "much more respectful" than he was at the beginning. He was attending therapy so that

7.

he could "work through * * * some childhood stuff that he didn't really necessarily want to talk with [foster mother] about * * *." Child 4's relationship with his siblings was "[v]ery good." Although he was doing "[p]retty good" academically, he was recently put on an individualized education plan because he was struggling with reading, language arts, and spelling.

{¶ 18} According to foster mother, child 5 "struggles a lot more than the other kids[,]" but was still "doing okay." Her primary concerns with child 5 were "manipulation and lying." When child 5 first came to the home, she was "inappropriate" with one of foster mother's children by "show[ing] her private parts to him[,]" but that behavior had stopped and there had not been "another incident in quite a while." Child 5 would wet or soil her pants during her video visits with father 2, but those incidents stopped when the video visits stopped. Foster mother thought that child 5 struggled to trust her and foster father, and noted that child 5 did not want to talk about "her childhood stuff" with either her therapist or foster mother. Child 5 also has ADHD and was having some issues with her medicine. Foster mother described child 5's relationship with her siblings as "pretty typical," and said that she was doing "pretty good" in school.

{¶ 19} Overall, the children got along well with the three other children in foster mother's home.

8.

{¶ 20} At the time of the hearing, child 5 was visiting mother every other week. The four older children had "not visited mom in a very significant period of time" because "they no longer want to live with mom, so they don't see a point in seeing her."

## 2. Caseworker's testimony

{¶ 21} Williams, who was the family's ongoing caseworker until shortly before the permanent custody hearing, testified about the family's history of involvement with the agency and their progress over the course of the case.

{¶ 22} LCCS opened a case with the family in 2019 for "pretty much the same concerns, domestic violence, physical abuse, neglect." The children were returned to mother in early 2020. In the roughly 18 months between the first case ending and the current case opening, Williams said that the agency received "[q]uite a few" referrals about the family. The referrals raised concerns about physical abuse of the children and lack of food. There were also two referrals about father 2 sexually abusing child 1 and child 2, which LCCS found to be "indicated." Although Williams did not know the details of the abuse, she said that "it was pretty severe sexual abuse to both of them." Mother was aware of the abuse, and Williams found it concerning that "mom was using language that suggested the kids might not have been telling the truth."

{¶ 23} Regarding mother's compliance with the case plan, Williams confirmed that mother's case plan services included a dual diagnosis assessment, domestic violence survivors' classes, parenting classes, and obtaining housing.

9.

{¶ 24} Mother underwent a dual diagnosis assessment as a result of her participation in the trial court's drug court program. There were no "specific diagnoses" regarding mother's mental health, but the mental health assessment recommended that mother engage in counseling for "general well being." Mother consistently attended counseling services.

{¶ 25} LCCS's primary concern about mother related to substance abuse. Mother engaged in substance abuse treatment as part of her participation in drug court. She was "in and out of [intensive outpatient programs] and aftercare throughout the entirety of her time in [drug] Court[,]" and the drug court's most recent recommendation was that mother return to inpatient treatment.

{¶ 26} According to Williams, mother had not made progress in drug court, primarily because she continued to test positive for drugs, including fentanyl, norfentanyl, methamphetamine, and codeine. Mother's positive drug screens were "pretty much consistent" and "[p]retty much every single month * * *" while mother was enrolled in drug court. Her most recent positive screen through drug court was less than two weeks before the first day of the permanent custody hearing. Because mother continued to have positive screens while enrolled in drug court, she was sent back to intensive outpatient treatment at one point, and stayed in an aftercare program "for quite some time * * *."

10.

{¶ 27} Mother denied using drugs, despite the positive drug screens.  Williams reported that each time mother had a positive drug screen, "she does followup [sic] with her providers to kind of explain that stuff to her."  According to Williams, mother gave "[t]he same explanation every time she tests positive.  She says she's not using and that she touches something in her old storage unit or she's hanging out with people that she may have touched, or they gave her something that she didn't know about.  And that's just been her reason the entirety of the case."  Williams did not know if the drug screens done through drug court gave different results than the screens done through other service providers.  She thought that some of mother's positive samples were sent for retesting, and was "pretty sure all of them came back positive."

{¶ 28} Domestic violence was LCCS's other major concern.  Mother completed domestic violence counseling several months before the permanent custody hearing, but according to Williams, there "still [were] a lot of concerns for mom even though she completed the service[,]" mostly because "[t]here were a lot of reports that mom was still involved with [father 1].  There were reports that they were in a relationship, and the way mom talked about him to her providers and to us at the Agency during meetings she made a lot of excuses, minimized for him and still maintained contact with him through a majority of the time."  Although Williams had not been able to verify that mother was in contact with father 1 after this case was filed, she had received reports of their contact from "multiple people, resources including children who have had phone calls with

[mother] saying that he's in the background of the phone calls[,]" and "family members" had told Williams that "they're together, they're in a relationship on Facebook and it's current."

{¶ 29} Even absent the domestic violence issue, Williams said LCCS had concerns about mother's substance use and her ability to provide for the children.

{¶ 30} As far as completing a parenting class, LCCS never gave mother a referral to the classes "[b]ecause of the lack of progress in the other services."

{¶ 31} Regarding mother's housing situation, at the time of the hearing, she was living with maternal grandmother. Williams admitted that she had not been to grandmother's home, so she did not know if it was an appropriate place for the children. She explained that the agency had concerns about grandmother—specifically that grandmother told the children "to lie to the Agency and other providers so that way they wouldn't be taken"—and that mother had not "gotten to th[e] point" of addressing housing. Williams did not talk to mother about LCCS's concerns regarding grandmother.

{¶ 32} LCCS did not offer or recommend family counseling because "[w]e typically don't start those until progress has been made. And with mom's ongoing substance abuse, that was never in the talks." Although Williams did not recommend family counseling, she had "spoken to mom on multiple occasions about her relationship with her children and what we think would be the best route to try to rectify that relationship." Williams recommended video visits and calls, but mother was "very, very

12.

late to the point where we had to miss them." Williams also suggested that mother write each child a letter "apologizing to them for what she's done to them[,]" but mother "didn't do that." Williams attempted "pretty much every avenue" before suggesting in-person visits because the children had "gone through a lot of trauma." When the children did not want to visit mother, Williams said that she "tried to work with mom to see if there was anything else we could attempt to do, and those things weren't happening."

{¶ 33} On the whole, Williams said, mother was "checking the boxes and going to her classes * * *" and "[s]he's made some progress, but [Williams] would say that she hasn't made enough." She did not feel that granting mother a six-month extension to complete her case plan services was appropriate because of mother's positive drug screens, lack of progress in drug court, and her "behavioral actions * * *."

{¶ 34} Regarding the children, Williams said that they were "doing really well." She did not have any immediate concerns for their mental health because they were actively engaged in counseling due to "a lot of past trauma * * *[,]" including being the victims of violence. The four oldest children were not visiting mother because she "lies to them and they don't trust her anymore, and they don't see a point in going." At the time of the hearing, the three oldest children had not visited with mother for almost a year, and child 4 had not visited her for several months. Child 5 chose to see mother every other week, despite being allowed weekly visits, because visits took most of the

13.

day on Saturday, and child 5 wanted to spend time with her siblings on the weekends. LCCS did not have any concerns about the visits.

{¶ 35} As far as the children's individual progress, Williams said that child 1 was working at a florist near her foster home. She had been diagnosed with depression and anxiety. Before the children were removed from mother's custody, child 1 told Williams that they were living at a motel, child 1 was "essentially parenting" the other children, and they did not have food or adequate supervision.

{¶ 36} Child 2 was working at a restaurant. He had been diagnosed with ADHD and depression, and was hospitalized for self-harming "recently." Before being removed from mother's custody, he told Williams that there was "lack of supervision, food, being physically abused by his father." Child 2 also told Williams that he had seen drugs in their motel room. Child 2 wanted to continue living with foster mother because "[h]e likes the stability of where he is."

{¶ 37} Child 3 had been diagnosed with ADHD. He said that they did not have food when they were living at the motel. Although Williams did not know if child 3 was the child sleeping outside of the motel room, she knew that people had "found the children sleeping outside of the motel room eating out of the vending machines, and they looked very dirty and tattered."

{¶ 38} Child 4 also wanted to stay with foster mother and his siblings. Williams did not believe that he had ever been abused.

14.

{¶ 39} Child 5 had been diagnosed with ADHD and had behaviors that were "more significant" than the other children's. Williams knew that child 5 was in therapy and had made progress, but her "biggest barrier is she's a liar. She doesn't know why, and she doesn't know how to stop[,]" which had slowed her progress. Foster mother reported issues with child 5's behavior, including "touching, getting too close to people, saying inappropriate things * * *, talking about rape[,] * * * urinating in her pants, defecating in her pants, things like that." For example, despite not fully understanding what the word "rape" means, child 5 would "make threats towards people saying her dad was going to rape them" because she thought it was "funny[.]" She also said that she thinks harming animals is funny. Foster mother reported that the other children in the house were "annoyed by" child 5, but never said that the other children "don't like her * * *." Foster mother had difficulty managing child 5's "bullying behaviors[,]" which caused tension between her and her siblings. Child 5 was addressing that in counseling. Regarding her placement, child 5 "goes back and forth. Part of her wants to go with mom, part of her wants to go to her dad, and part of her wants to go with [foster mother] and her siblings."

{¶ 40} Williams "100 percent believe[d]" that granting LCCS permanent custody of the children was in their best interests. She reached this conclusion because the children had not experienced stability for most of their lives. They had moved around frequently, had not had food or their basic needs met, and "haven't been able to be in an

15.

environment to thrive and be the children that they want to be and just be children." This had changed since they went into foster care and the children "have really become their own people." Essentially, the children were "thriving."

{¶ 41} Additionally, Williams did not think that mother would be able to care for all five children because mother had not "ma[d]e even a little bit of progress" toward alleviating the agency's concerns despite the case being open for "a long period of time * * *." Based on things mother said, Williams did not think that mother was "ready to admit to herself that she needs to change or that she needs to change her environment and the people around her * * *." She was also concerned that LCCS had been involved with the family multiple times for the same reasons.

{¶ 42} Although Williams admitted that mother's relationship with child 5 was better than her relationships with the other children, she did not believe that giving mother more time to work on reunification was in child 5's best interest. As Williams put it, "just because mom and [child 5] have a better relationship doesn't mean that mom is ready to take care of these children, including [child 5]."

{¶ 43} After Williams's testimony, LCCS submitted voluminous exhibits containing mother's records regarding her substance abuse treatment and drug screens, judgment entries from the drug court, judgment entries from the 2019 LCCS case, records of mother's involvement in municipal court cases and with the Toledo Police Department, the children's counseling records, and records from child 2's hospitalization.

16.

### 3. GAL's testimony

{¶ 44} In her testimony, the GAL summarized the wishes of the children. Child 1, child 2, child 3, and child 4 did not want to be reunified with mother or father 1 and wanted to stay in their foster placement. Child 5 wanted to live with both mother and father 2, "but has been back and forth regarding her wishes." Although child 5 had gone back and forth on where she wanted to live, recently she had "indicated to her current placement that she wishes to be adopted at her current placement." She seemed "happy and stable" in the foster home.

{¶ 45} The GAL talked to mother about her concerns and said that mother was "open and honest with regard to her shortcomings." But mother's drug test results and housing situation, along with "the level of involvement with Children Services [and] the disclosures of the children * * *" indicated to the GAL that mother could not remedy all of the issues with in the statutorily-permitted time for resolving the case, and she did not think that reunifying with mother was in the children's best interests.

{¶ 46} Instead, the GAL thought that awarding LCCS permanent custody of the children was in their best interests. She based her recommendation on the "duration in which the Agency has been working with the family [and] the severity of what these children have gone through"—including "homelessness, lack of food, physical abuse, sexual abuse * * * [and] see[ing] domestic violence." Although she knew that awarding permanent custody to LCCS was "very serious[,]" she believed that permanent custody

17.

was "necessary." The children were currently in an environment where they could "thrive and be children."

#### 4. Mother's testimony

{¶ 47} Most of mother's testimony focused on her compliance with the case plan. She testified that she completed her dual diagnosis assessment within a month or two of LCCS opening this case. She was diagnosed with ADHD and was taking medicine to treat it.

{¶ 48} Mother started drug court around the same time she completed her assessment. She explained that she would attend treatment appointments at her substance abuse treatment provider, and someone from the provider would report back to the drug court on her "overall compliance with [her] treatment." Drug court required her to go to a certain number of "sober support meetings" every week and call daily to see if she had to submit to a drug screening that day. Mother admitted that she left an inpatient treatment program required by drug court against medical advice and did not complete the inpatient program. She did so because being in the program made her feel "even further away from [her] kids * * *[,]" and she did not think that she was benefiting from the treatment.

{¶ 49} At the time of the hearing, mother was attending drug court every week because of her positive drug screens. She acknowledged all of the positive screens, but said that she did not know how fentanyl got into her system. She thought that it might

18.

have been something in her storage unit that was causing the problems, but also said that she still had positive drug screens when she did not visit the storage unit for an extended period of time.

{¶ 50} Despite the positive screens, mother said that she was not using drugs. Throughout her testimony, she denied using drugs after June 2022, when LCCS removed the children. To support her claim, mother said that her suboxone treatment would "cancel norfentanyl out" and she did not see the point of using a drug that would not "give [her] the effect" and would "get [her] into this much trouble[.]" She also explained that she did not care about things like hygiene or making appointments when she was actively using, and appearing regularly at drug court is not something she would have done while actively using. Completing some of the case plan programs and regularly attending treatment was "a lot of progress" for her.

{¶ 51} When mother's attorney asked her to explain her failed drug tests, she said,

> I don't know how to explain it. I know that I am not now and have not been using. And talking to my doctor is why I would assume that it's something in my environment because looking at the levels of the drug tests it's low amounts of norfentanyl, and there's been times where there's been low amounts of the other things, like, fentanyl and codeine. * * * [I]t's completely clean one day and then another low amount, and then

19.

completely clean the next day. So it's very, very random. * * * [I]t's been very hard for me to pinpoint where it's coming from or what it is.

She was not able to provide any other explanation for the positive drug screens.

{¶ 52} Mother also said that she could obtain housing. She had been working for several months, but had not gotten her own place because she "just wanted to kind of see what was going on with the kids * * *." LCCS had not offered her any help with obtaining housing. It was her understanding that the agency could not offer housing assistance because of her positive drug screens. She wanted to live in sober living housing, did not qualify for it because she did not have six months of clean drug screens.

{¶ 53} Mother was working to change her environment to ensure that she was not exposed to and testing positive for drugs. She thought that having her own house might affect the results of her drug screens, but did not believe that she was exposed to drugs at grandmother's house, where she was living. However, she later admitted that the children could be exposed to "a low dose of fentanyl if reunified with [her] in [her] current environment[.]" Ultimately, mother was unable to determine where, exactly, she might be coming into contact with fentanyl.

{¶ 54} Regarding the agency's domestic violence concerns, mother thought that her relationship with father 1 had been "blown out of proportion." She said that she did not have "much of a relationship" with father 1 at the time of the hearing and that she "left him. Like, we're not together[,]" and they had not been in a relationship since about

20.

two months after this case was opened. She admitted that father 1 was with her during some phone calls because "[h]e would just show up around where [she] was." She also admitted that she had contact with father 1 approximately one month before the permanent custody hearing when she saw him at the grocery store, and said that he had visited her at grandmother's house in the past, but no longer did.

{¶ 55} Regarding her relationships with the children, mother said that her visits with child 5 "go really good." She understood why the four older children did not want to visit her or live with her. She did not call the children because after "calling [her] daughter a couple of times, [she was] accused of harassing." She also claimed that she had written the children letters, as Williams suggested, but she did not have their address to mail them, they did not attend visits with her, she did not want to give them to child 4 or child 5 when she had visits with them, and she was unable to give them to the GAL when she planned to because the GAL had an emergency and did not come to the appointment. Before LCCS filed the permanent custody motion, mother asked caseworkers about family counseling because she was worried about the children not coming to visits and "losing [her] relationship with [her] kids[,]" but LCCS did not provide this service.

{¶ 56} In response to Williams's concern about mother's treatment of child 1 and child 2's reports that they were sexually abused, mother said that the only allegations she was aware of came from child 2 telling her about the abuse while he was in foster care

during the 2019 case, and child 1 reporting the abuse to her foster father while she was in foster care in 2019.

{¶ 57} Ultimately, mother asked the court for "an extension for me to better myself for the betterment of my children." She said that she wanted more time so she could continue with her services and obtain adequate housing. She thought additional time to complete her case plan services was in the children's best interests because she was their mother and had raised them, and she did not "think that it would be good for them to be told that because [she] had an issue * * * it's okay to just completely cut [her] off from their life." She also expressed her love for her children and her desire to continue her relationships with them. Mother's attorney also asked the court for additional time to allow mother to complete her case plan services because mother had been attending drug court and would "like the opportunity to continue on a path toward sobriety and clear up any of [the] issues" with her positive drug screens.

### E. Trial court's decision

{¶ 58} In its June 26, 2023 judgment entry, the trial court terminated mother's parental rights and awarded permanent custody of the children to LCCS. In doing so, the court found by clear and convincing evidence that the children could not be placed with their parents within a reasonable time and should not be placed with their parents, and awarding permanent custody to LCCS was in the children's best interests. The court also found that reunifying with their parents would be contrary to the children's best interests.

22.

{¶ 59} Under R.C. 2151.414(B)(1)(a), the court determined that the children could not be placed with any of the parents within a reasonable time and should not be placed with any of the parents.

{¶ 60} In determining that the children could not or should not be placed with mother, the court made findings under R.C. 2151.414(E)(1) and (4).

{¶ 61} As to (E)(1), the court found that mother continuously and repeatedly failed to substantially remedy the conditions that caused the children to be placed outside of the home, despite reasonable case planning and diligent efforts by LCCS. The court found that mother failed to remedy her substance abuse issues, domestic violence issues, and lack of independent housing. Mother engaged in substance abuse treatment, but none of the other case plan services due to her failure to satisfactorily complete substance abuse treatment. That is, mother continued to "consistently test positive for illicit substance[s] even though she is engaged in and attending substance abuse treatment." Specifically, the court found that mother tested positive for norfentanyl 16 times and for fentanyl five times during the pendency of the case. The court did "not find her explanations for testing positive reasonable." The court concluded that mother "has not demonstrated a sober life-style and has made no progress in alleviating her substance abuse issues despite engaging in treatment." The court also noted that LCCS had reason to believe that mother continued to have "significant contact" with father 1, who was her alleged abuser.

23.

**{¶ 62}** As to (E)(4), the court found that mother demonstrated a lack of commitment to the children by failing to regularly visit or communicate with them when she was able to, or by other actions showing her unwillingness to provide an adequate permanent home for them. The court based this finding on the older children's refusal to visit or have any contact with mother because "[t]hey have suffered such significant trauma while in her care, they do not wish to be involved with her." The court again noted mother's continued use of illicit substances, lack of appropriate housing for herself and the children, and maintaining her relationship with father 1.

**{¶ 63}** Finally, the court determined under R.C. 2151.414(D)(1) that it was in the children's best interests to award LCCS permanent custody. Specifically, the court found that (1) the three oldest children did not visit or interact with mother because of the trauma she had exposed them to; (2) child 4 was visiting mother less frequently because he preferred to spend time with his siblings at the foster home and mother also exposed him to trauma; (3) child 5 regularly visited mother and had expressed interest in living with mother in the past, but she most recently said that she wanted to be adopted and stay with her siblings; (4) the children were well cared for in their foster placement; (5) the four oldest children wanted to be adopted, and child 5 most recently said that she also wanted to be adopted and stay with her siblings; (6) this was the second time the children were removed from mother's custody and, although mother completed services and regained custody of the children in 2019, the "improvement was short lived and the

24.

mother's life deteriorated again soon after the children returned to her care[;]" (7) the children had been in LCCS's custody for over 11 months at the time of the hearing; (8) the children were placed together in a foster home that was addressing all of their needs, including ongoing trauma therapy; (9) the children's foster parents had expressed a desire to adopt them; (10) LCCS did not know of any appropriate relative placements for the children; and (11) the GAL's investigation supported the conclusion that awarding LCCS permanent custody was in the children's best interests.

{¶ 64} After considering all of the evidence and making detailed findings, the trial court awarded permanent custody of the children to LCCS and terminated mother's parental rights.

{¶ 65} Mother now appeals, raising three assignments of error:

ASSIGNMENT OF ERROR NO. 1: The trial court errored [sic] in finding that Lucas County Children Servies [sic] made the requisite reasonable efforts under Ohio Rev. Code Ann. § 2151.419 prior to pursuing permanent custody.

ASSIGNMENT OF ERROR NO. 2: The trial court acted against the manifest weight of evidence in denying Appellant-Mother's request for an extension of time as the record reflects her engagement in services and acknowledgment of the serious underlying issues in her relationship with her children.

25.

ASSIGNMENT OF ERROR NO. 3:  The trial court error [sic] in finding clear and convincing evidence that the permanent parental rights of Appellant-Mother should be terminated under Ohio Rev. Code Ann. § 2151.414.

## II. Law and Analysis

{¶ 66} In her first assignment of error, mother argues that LCCS did not make reasonable efforts to reunify her with the children because the agency did not provide resources to help her obtain suitable housing or assist her with taking steps to repair her relationships with the children.  In her second assignment of error, she argues that the trial court's denial of additional time for her to complete case plan services was against the manifest weight of the evidence.  And in her third assignment of error, she essentially argues that the trial court's findings under R.C. 2151.414(E)(1) and (4) are against the manifest weight of the evidence.

{¶ 67} LCCS responds that the trial court was not required to make a reasonable-efforts determination for a permanent-custody motion filed under R.C. 2151.413, and the court's decision to deny mother's request for an extension and its R.C. 2151.414(E) findings were supported by clear and convincing evidence.

{¶ 68} We address each argument in turn.

26.

**A. The law of permanent custody.**

{¶ 69} Revised Code 2151.414 provides the analysis that a trial court must undertake when considering whether to terminate parental rights and vest permanent custody in a children services agency. Under that provision, the court must first find that one of the circumstances described in R.C. 2151.414(B)(1)(a)-(e) exists. As applicable here, subsection (a) requires the court to find that the child has not been abandoned or orphaned, has not been in the custody of a public children services agency or a private child placing agency for at least 12 months of a consecutive 22-month period, and cannot be placed with either parent within a reasonable time or should not be placed with either parent.

{¶ 70} If the court finds that R.C. 2151.414(B)(1)(a) applies, it must consider both whether granting permanent custody to the agency is in the child's best interest and whether any of the factors enumerated in R.C. 2151.414(E) are present that would indicate that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent. *In re B.K.,* 6th Dist. Lucas No. L-10-1053, 2010-Ohio-3329, ¶ 42-43. If the court finds that at least one factor in R.C. 2151.414(E) applies, it must then determine whether awarding permanent custody to the agency is in the child's best interest by considering the factors in R.C. 2151.414(D)(1).

{¶ 71} All of the court's findings under R.C. 2151.414 must be by clear and convincing evidence. "Clear and convincing evidence" is evidence sufficient for the trier

27.

of fact to form a firm conviction or belief that the essential statutory elements for a termination of parental rights have been established. *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954), paragraph three of the syllabus; *In re Tashayla S.*, 6th Dist. Lucas No. L-03-1253, 2004-Ohio-896, ¶ 14.

{¶ 72} We review a trial court's determination in a permanent custody case under a manifest-weight-of-the-evidence standard. *In re P.W.*, 6th Dist. Lucas No. L-12-1060, 2012-Ohio-3556, ¶ 20; *see also In re Z.C.*, Slip Opinion No. 2023-Ohio-4703, ¶ 11 ("Given that R.C. 2151.414 requires that a juvenile court find by clear and convincing evidence that the statutory requirements are met, * * * the sufficiency-of-the-evidence and/or manifest-weight-of-the-evidence standards of review are the proper appellate standards of review of a juvenile court's permanent-custody determination, as appropriate depending on the nature of the arguments that are presented by the parties."). In doing so, we must weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether the trier of fact clearly lost its way in resolving evidentiary conflicts so as to create such a manifest miscarriage of justice that the decision must be reversed. *Z.C.* at ¶ 14, citing *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 20. But while we review the evidence and consider the witnesses' credibility, we must be mindful that the trial court, as the trier of fact, is in the best position to weigh evidence and evaluate testimony. *P.W.* at ¶ 20. Its discretion in determining whether an order of permanent custody is in the best interest of a child

28.

"should be accorded the utmost respect, given the nature of the proceeding and the impact the court's determination will have on the lives of the parties concerned." (Internal quotations omitted.) *In re C.P.,* 10th Dist. Franklin No. 08AP-1128, 2009-Ohio-2760, ¶ 10. If the evidence is susceptible to more than one interpretation, we are bound to interpret it in a way that is consistent with the trial court's judgment. *Z.C.* at ¶ 14, quoting *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984), fn. 3.

### B. The trial court acted within its discretion when it denied mother's request for an extension.

{¶ 73} We first address mother's second assignment of error. In it, mother argues that the trial court's denial of her request for an extension to complete her case plan services was against the manifest weight of the evidence. She contends that she was consistently engaged with her recommended services, intended to continue with services, and her progress showed that she could reunify with the children within a six-month extension. LCCS responds that the trial court properly denied mother an extension because she had not made substantial progress on her case plan goals.

{¶ 74} Under R.C. 2151.415(D)(1), the trial court can extend an agency's temporary custody for up to six months if it finds, by clear and convincing evidence, that (1) the extension is in the child's best interest, (2) there has been significant progress on the case plan, and (3) there is reasonable cause to believe that the child will be reunified with the parent or permanently placed during the period of the extension. The trial court

29.

has discretion to grant or deny an extension. *In re I.P.*, 6th Dist. Lucas No. L-15-1136, 2015-Ohio-4061, ¶ 29. Accordingly, we review the trial court's decision on a motion for extension for an abuse of discretion. *In re E.H.*, 5th Dist. Stark No. 2022CA00007, 2022-Ohio-1682, ¶ 74. Abuse of discretion means that the trial court's decision was unreasonable, arbitrary, or unconscionable. *State ex rel. Askew v. Goldhart*, 75 Ohio St.3d 608, 610, 665 N.E.2d 200 (1996).

{¶ 75} In this case, nothing in the record indicates why the trial court declined to grant mother's request to extend temporary custody.[1] Nevertheless, we do not find this to be an abuse of discretion.

{¶ 76} At the time of the permanent custody hearing, mother (1) had completed a domestic violence class, but remained in contact with her abuser (i.e., father 1) and continued to make excuses for him and minimize his behavior; (2) was in substance abuse treatment and participating in drug court, but regularly tested positive for drugs and provided explanations for the test results that the trial court "d[id] not find * * * reasonable[;]" (3) had not completed parenting classes because of her positive drug screens; (4) lived with grandmother, whom LCCS considered problematic because of her

---

[1] The transcript notes that the trial court held a "[d]ecision hearing" on June 12, 2023, but the hearing "could not be transcribed due to error in digital recording." Mother did not file an App.R. 9(C) statement of evidence regarding the June 12 hearing, so we are unable to determine whether the trial court explained its reasons for denying the extension and must presume the regularity of the proceeding. *In re C.H.*, 6th Dist. Erie No. E-18-063, 2020-Ohio-135, ¶ 28.

30.

history of telling the children to lie to authorities about their home situation; (5) admitted that the children could be exposed to "a low dose of fentanyl if reunified with [her] in [her] current environment[;]" (6) had only been employed for about three months and did not present any information about her plans to obtain suitable, independent housing beyond saying that she "could obtain housing" but had not done so and was "waiting because [she] just wanted to kind of see what was going on with the kids * * *[;]" and (7) had not seen the four oldest children for months and did not follow through with LCCS's suggestions for improving those relationships. As Williams put it, mother was "completing these things and going to these things regularly, but still continuing to do those behaviors. She's continuing to use. She's continuing to have allegedly some contact with her batterer. She's still minimizing her batterer. * * * She's checking the boxes and going to her classes, * * * [s]he's made some progress, but * * * she hasn't made enough."

{¶ 77} Additionally, the evidence showed that the children were "thriving" in their foster placement. All of their physical, medical, and emotional needs were being met, and they were no longer in an environment that exposed them to significant trauma. Notably, four of the five children did not want to return to living with mother.

{¶ 78} Taken together, this does not show that mother made significant progress on her case plan, there was reasonable cause to believe that mother would be reunified with the children within six months of the permanent custody hearing, or an extension

was in the children's best interests.  Thus, we cannot say that the trial court abused its discretion by denying mother's request for an extension of temporary custody.  Mother's second assignment of error is not well-taken.

## C. The trial court's reasonable efforts findings are supported by the evidence.

{¶ 79} In mother's first assignment of error, she argues that the trial court's finding that LCCS made reasonable efforts to reunify her with the children was against the manifest weight of the evidence.  The state argues only that R.C. 2151.419(A) does not apply to permanent custody hearings, so the trial court was not required to make a reasonable-efforts determination.

{¶ 80} Generally speaking, under R.C. 2151.419(A)(1), the state must make reasonable efforts to reunify a family before seeking to terminate parental rights.  *In re C.F.,* 113 Ohio St.3d 73, 2007-Ohio-1104, 862 N.E.2d 816, ¶ 21.  The Ohio Supreme Court has recognized that, by its terms, R.C. 2151.419 "does not apply to motions for permanent custody brought pursuant to R.C. 2151.413, or to hearings held on such motions pursuant to R.C. 2151.414." *Id.* at ¶ 41.  But, it explained, "[t]his does not mean that the agency is relieved of the duty to make reasonable efforts." *Id.* at ¶ 42.  In fact, when "the trial court relies on R.C. 2151.414(E)(1) at a permanency hearing, the court must examine the 'reasonable case planning and diligent efforts by the agency to assist the parents' when considering whether the child cannot or should not be placed with the parent within a reasonable time." *Id.*  In this case, the trial court relied on R.C.

32.

2151.414(E)(1) when awarding LCCS permanent custody of the children, so simply saying that R.C. 2151.419 does not apply to permanent custody hearings is not enough to resolve this assignment of error.

{¶ 81} We review a trial court's reasonable-efforts finding under a manifest-weight standard. *In re E.H.*, 6th Dist. Ottawa No. 2016-Ohio-8170, ¶ 23, citing *In re Er.P.*, 6th Dist. Lucas No. L-14-1006, 2014-Ohio-2831, ¶ 24-25. Because the trial court is in the best position to weigh the evidence and evaluate the testimony, we will not reverse its judgment if there is some competent, credible evidence supporting its reasonable efforts findings. *Er.P.* at ¶ 20. The agency has the burden of proving that it made reasonable efforts to reunite the family. *In re Am.H.*, 6th Dist. Lucas No. L-19-1025, 2019-Ohio-4374, ¶ 27, citing R.C. 2151.419(A)(1).

{¶ 82} The term "reasonable efforts" encompasses the state's efforts to resolve the threat that required the child's removal from the home and to permit the child to return home after the threat is removed. *In re S.R.*, 6th Dist. Lucas Nos. L-12-1298 and L-12-1326, 2013-Ohio-2358, ¶ 28. What constitutes "reasonable efforts" depends on the circumstances of the case. *In re Q.S.*, 2023-Ohio-712, 210 N.E.3d 610, ¶ 125 (8th Dist.), citing *In re C.B.C.*, 4th Dist. Lawrence Nos. 15CA18 and 15CA19, 2016-Ohio-916, ¶ 76. To be reasonable, the state's efforts must be "'honest, purposeful effort[s], free of malice and the design to defraud or to seek an unconscionable advantage.'" *S.R.* at ¶ 21, quoting *In re Weaver*, 79 Ohio App.3d 59, 63, 606 N.E.2d 1011 (12th Dist.1992). "In a

33.

reasonable efforts determination, the issue is not whether the agency could have done more, but whether it did enough to satisfy the reasonableness standard under the statute." *Id.* The child's health and safety are "paramount" when determining whether the agency made reasonable efforts. *Am.H.* at ¶ 27.

{¶ 83} Here, mother argues that LCCS's efforts were less than reasonable because the agency did not provide additional resources that mother asked for—like family counseling—and did not assist her with obtaining appropriate housing. However, Williams testified that LCCS did not refer mother to additional services, including parenting classes, because the agency needed mother to resolve her substance abuse issues first. Mother was aware of the agency's requirements; the family's case plan—which mother agreed to and signed—specifically said that LCCS would refer mother to certain services only after she made sufficient progress in other areas. But, in LCCS's view, mother did not make sufficient progress because she had positive drug screens throughout the entirety of the case, despite attending treatment, and reportedly had contact with and made excuses for her abuser, despite completing domestic violence classes.

{¶ 84} Regarding family counseling, specifically, Williams said that the agency "typically [w]on't start th[at] until progress has been made. And with mom's ongoing substance abuse, that was never in the talks." Instead of offering family counseling, Williams discussed other things mother could do to mend her relationships with the

34.

children—i.e., Williams tried to help mother with the relationships despite her lack of progress with her case plan services—but mother did not follow through with Williams's suggestions. Under the circumstances of this case, including mother's ongoing positive drug screens and the serious trauma the children experienced while in mother's custody, LCCS's decision to try to help mother repair her relationships without involving the children in family counseling was reasonable, and is supported by some competent, credible evidence. The fact that the agency was unsuccessful or could have done more does not mean that its efforts were unreasonable. *See In re V.B.-S.*, 10th Dist. Franklin No. 13AP-478, 2013-Ohio-5448, ¶ 48 (agency's efforts were reasonable—albeit unsuccessful—and trial court was not required to amend case plan to include additional efforts toward reunification).

{¶ 85} As far as housing, Williams did not explain why the agency failed to offer resources to help mother find stable housing, other than mentioning that "[t]here was some talks in [drug] Court that [mother] was trying to get her own place" and saying that she had not visited grandmother's house—where mother was living—"because we haven't gotten to that point * * *." This does not show that LCCS made reasonable efforts to help mother with housing. However, under R.C. 2151.414(C), the fact that "the agency failed to implement any particular aspect of * * *" the case plan, standing alone, is not a basis for denying a motion for permanent custody, and does not show that the agency's efforts were unreasonable. *In re S.T.*, 10th Dist. Franklin No. 19AP-24, 2019-

35.

Ohio-4341, ¶ 25. Thus, although LCCS failed to show that it made reasonable efforts to help mother obtain stable housing, the trial court's reasonable efforts findings, on the whole, are not against the manifest weight of the evidence because this is the only part of the case plan for which LCCS failed to demonstrate that it made reasonable efforts.

{¶ 86} Because the trial court's findings that LCCS made reasonable efforts to return the children to mother's custody are supported by the manifest weight of the evidence, mother's first assignment of error is not well-taken.

**D. The trial court's R.C. 2151.414(E) findings are supported by the evidence.**

{¶ 87} In her final assignment of error, mother argues that the trial court's findings under R.C. 2151.414(E) are against the manifest weight of the evidence; she contends that she neither continuously and repeatedly failed to remedy the conditions that caused the children to be removed, nor demonstrated a lack of commitment toward the children. In response, LCCS argues that mother failed to remedy the conditions that led to the children's removal, despite completing case plan services, and cannot provide a safe, stable home for the children.

{¶ 88} The trial court found that R.C. 2151.414(B)(1)(a) applies in this case, so it examined the R.C. 2151.414(E) factors. "[A] court need only find one factor under R.C. 2151.414(E) to support a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent * * *." *In re Carlos R.*, 6th Dist. Lucas No. L-07-1194, 2007-Ohio-6358, ¶ 38; *C.F.*, 113 Ohio St.3d 73, 2007-Ohio-

36.

1104, 862 N.E.2d 816, at ¶ 50, citing *In re William S.*, 75 Ohio St.3d 95, 661 N.E.2d 738 (1996), syllabus.

{¶ 89} As relevant here, the court found that R.C. 2151.414(E)(1) and (4) were applicable to mother. The statute provides:

(1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.

* * *

(4) The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child * * *.

37.

R.C. 2151.414(E).

**{¶ 90}** The record shows that mother complied with some of the terms of the case plan and made some progress toward attaining her case plan goals. But completing the terms of the case plan does not automatically mean a parent and child can or should be reunified; the ultimate question under R.C. 2151.414(A) is whether the parent remedied the issues that caused the child to be removed from the home, *not* whether the parent did everything in the case plan. *E.H.*, 5th Dist. Stark No. 2022CA00007, 2022-Ohio-1682, at ¶ 86. The children were removed from mother primarily because of substance abuse and domestic violence. Thus, those were the issues she needed to resolve for the children to be returned to her. However, the trial court found that mother continued to have contact with her abuser and continued to test positive for fentanyl and norfentanyl despite completing a domestic violence class and engaging in ongoing substance abuse treatment. Although mother provided explanations for her contact with father 1 and the positive drug screens, the trial court's judgment entry shows that it did not find her explanations credible or persuasive. The trial court was in the best position to evaluate her testimony on these points, and we are bound to construe evidence that is susceptible to more than one interpretation in a manner consistent with the trial court's decision. *Z.C.*, Slip Opinion No. 2023-Ohio-4703, at ¶ 14.

**{¶ 91}** Considering that the children were removed from mother once before due to similar concerns, and mother had nearly a year in this case to make necessary changes,

38.

but did not sufficiently remedy the substance abuse and domestic violence concerns that caused the children's removal, we cannot say that the trial court lost its way and created a manifest miscarriage of justice by determining that the children could not be placed with mother in a reasonable time, should not be placed with mother, and mother demonstrated a lack of commitment to the children through her unwillingness to provide them an adequate permanent home. Therefore, the trial court's findings under R.C. 2151.414(E) are not against the manifest weight of the evidence, and mother's third assignment of error is not well-taken.

### III. Conclusion

{¶ 92} We have thoroughly reviewed the record of proceedings in the trial court, including the trial testimony and exhibits. We find that the trial court's decision was supported by clear and convincing evidence and was not against the manifest weight of the evidence. Mother's assignments of error are without merit.

{¶ 93} Therefore, the June 26, 2023 judgment of the Lucas County Court of Common Pleas, Juvenile Division, is affirmed. Mother is ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.


Christine E. Mayle, J.        _____
                   JUDGE

Myron C. Duhart, J.

                  _____
Charles E. Sulek, P.J.         JUDGE
CONCUR.

                  _____
                   JUDGE

This decision is subject to further editing by the Supreme Court of
Ohio's Reporter of Decisions.  Parties interested in viewing the final reported
version are advised to visit the Ohio Supreme Court's web site at:
http://www.supremecourt.ohio.gov/ROD/docs/.