**[Cite as *In re R.B.*, 2025-Ohio-1579.]**

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

In re R.B., C.W., D.W.

Court of Appeals No. L-25-00012

Trial Court No. JC22291010

**DECISION AND JUDGMENT**

Decided: May 2, 2025

* * * * *

Anthony R. McGeorge, for appellee.

Laurel A. Kendall, for appellant.

* * * *

**DUHART, J.**

**{¶ 1}** This is an appeal by appellants, J.W. and D.B., from the December 19, 2024 judgment of the Lucas County Court of Common Pleas, Juvenile Division, granting permanent custody of three children to appellee, Lucas County Children's Services ("LCCS" or "the agency"). For the reasons that follow, we affirm the judgment.

**Parties**

**{¶ 2}** Appellant, J.W., is the mother ("mother") of the three children at issue in this appeal: D.W., born in July 2010; R.B., born in October 2013, and C.W., born in June

2017. Mother also has an older child ("oldest child") who is an adult with her own children. The oldest child is not directly involved in this appeal.

{¶ 3} Appellant, D.B., is the father ("father") of R.B. and the suspected father of C.W.

{¶ 4} D.W.'s father is D.S. ("dad"), but dad is not a party to this appeal and will only be mentioned when applicable to matters in this appeal.

{¶ 5} At all times relevant, mother and father did not live together.

### Assignments of Error

{¶ 6} Mother and father set forth two assignments of error:

I.      The trial court's decision to terminate mother's custody of all the children here was an abuse of discretion by the trial court, and/or not supported by the manifest weight of the evidence, when she had completed all of her case plan services, including obtaining and maintaining stable housing, and when the younger two children consistently asked to live with her.

II.     The trial court's decision to terminate father's custody of the two younger children here an abuse of discretion, and/or was not supported by the manifest weight of the evidence, when he had completed all of his case plan services, and was not the party responsible for the removal of the children.

### Background

**2022**

{¶ 7} LCCS became involved with the family after mother stabbed father on September 7, 2022, at father's home while the three children were present. Mother was

2.

criminally charged with felonious assault.[1]  LCCS investigated and discovered that mother was staying with a relative while attempting to stabilize her living situation, the three children were staying with father and were not enrolled in school, nor were they home-schooled.

{¶ 8} On September 29, 2022, LCCS filed a complaint alleging dependency and neglect. A shelter care hearing was held that same day for the children, which mother and father attended.  The juvenile court found probable cause existed for the issuance of a shelter care order and the placement of the children into care to protect them from immediate or threatened physical or emotional harm.  The court awarded interim temporary custody of the children to LCCS, and the children were placed in foster care.

{¶ 9} On October 27, 2022, the original case plan was filed, which was adopted by the juvenile court.  Updated case plans were also filed and adopted.  Mother's case plan services required that she: (1) participate in a dual assessment and follow the recommendations, (2) participate in a domestic violence batterers program, (3) participate in a domestic violence survivors service, (4) participate in an interactive parenting program, and (5) obtain independent housing.  Father's services required that he: (1) participate in a dual assessment and follow all recommendations, (2) participate in an interactive parenting program, (3) participate in a domestic violence batterers program,

---

[1] Mother was convicted of aggravated assault and sentenced to 60 days in work release and two years of community control.  Her community control was terminated early.

and (4) participate in a domestic violence survivors service. The children's case plan services required that they each participate in counseling.

{¶ 10} On November 29, 2022, an adjudication hearing was held which father attended but mother did not. The juvenile court found the children were dependent and neglected. A dispositional hearing was also held and the court granted temporary custody of the children to LCCS. The children remained in foster care.

{¶ 11} Since R.B. and C.W. were removed from the home, they refused to visit father.

**2023**

{¶ 12} Father participated in a dual assessment in March 2023, where intensive outpatient treatment ("IOP") and detox were recommended. Father completed a detox assessment but refused to participate in IOP.

{¶ 13} On July 6, 2023, LCCS filed to extend temporary custody of the children; an extension was granted.

{¶ 14} In September 2023, due to emergencies with D.W. and C.W.'s foster care and because mother had completed her case plan services, LCCS recommended that mother have an extended visit with D.W. and C.W. at mother's home. R.B. stayed in foster care as there was no emergency, but he had unsupervised visits with mother.

{¶ 15} On September 26, 2023, LCCS filed a "Motion to Change Placement, Terminate Temporary Custody, and Determine Support and Visitation" and requested that mother be granted legal custody of the children with protective supervision by

4.

LCCS. However, on November 21, 2023, mother was arrested and charged with criminal damaging, obstructing official business and resisting arrest.[2] Mother's oldest child was also arrested. D.W. and C.W. were again placed in foster care. On November 22, 2023, LCCS moved to dismiss the "Motion to Change Placement, Terminate Temporary Custody, and Determine Support and Visitation," and extend temporary custody.

{¶ 16} In December 2023, mother's visits with the children were moved from Level 2 to Level 1 due to the children's behaviors during visits. D.W. was verbally and physically aggressive with R.B., and when brought to mother's attention, she said the kids were just playing. Also, a child was "humping the air" towards another child, in a sexualized way.

{¶ 17} On December 18, 2023, D.W.'s dad filed for legal custody of D.W.

{¶ 18} In December 2023 or January 2024, father started to participate again in case plan services. The lapse in services was due to his health issues and being discouraged that the children were removed from his care.

{¶ 19} Throughout 2023, R.B. and C.W. refused to visit father.

**2024**

{¶ 20} On January 9, 2024, LCCS filed for permanent custody of R.B. and C.W.

---

[2] The charges were dismissed in January 2024.

5.

{¶ 21} On January 19, 2024, the guardian ad litem ("GAL") filed a motion to appoint counsel for the children because their wishes were not aligned with the GAL's opinion.[3]

{¶ 22} In March 2024, father started visits with R.B., but C.W. refused visits. Father was required to call one hour before visits, but there were times that father did not call so visits were not held.

{¶ 23} On April 24, 2024, father was arrested and charged with aggravated burglary.

{¶ 24} On May 24, 2024, D.W. started an extended visit with dad at dad's home.

{¶ 25} On June 11, 2024, the first day of the permanent custody hearing ("the hearing") for R.B. and C.W. was held. Father's counsel informed the court that father was not seeking custody of the children due to medical issues which prevented him from completing his case plan, but father wanted to maintain a relationship with the children.

{¶ 26} In June 2024, mother called 911 due to an altercation between her oldest child and the oldest child's boyfriend. Mother was not arrested or charged with any crimes, but her oldest child was arrested and charged with domestic violence.

{¶ 27} On September 16, 2024, dad brought D.W. to the courthouse and dropped D.W. off with the caseworker. Dad informed his counsel and the caseworker that he no longer desired custody of D.W.; dad left. D.W. was placed at Safety Net, a runaway shelter, for three days before he went to foster care. Mother visited D.W. at Safety Net.

---

[3] The motion to appoint counsel was granted.

6.

**{¶ 28}** On September 26, 2024, LCCS filed for permanent custody of D.W.

**{¶ 29}** On October 24, 2024, the second day of the hearing was held.

**{¶ 30}** On December 19, 2024, the juvenile court issued its judgment entry awarding permanent custody of the children to LCCS. Mother and father appealed.

## Permanent Custody Hearing

### Caseworker Jerik

**{¶ 31}** Hannah Jerik was the only witness called to testify on the first day of the hearing, June 11, 2024, and she was also called to testify on the second day of the hearing, October 24, 2024. Her testimony is summarized below.

**{¶ 32}** Jerik was a LCCS ongoing caseworker and worked with the family since the case opened on September 29, 2022, although LCCS had a long history with the family with about 40 "intakes" concerning the children. All three children told Jerik they loved mother and wanted to return to mother's home. However, Jerik believed permanent custody of the children should be awarded to LCCS.

**Mother**

**{¶ 33}** Jerik testified to the following regarding mother. Mother was informed by LCCS that her oldest child could not be at mother's home due to concerns about their relationship. With respect to the case plan, mother completed a domestic violence batterers program in January 2023, a domestic violence survivors program in April 2023, and a parenting program in June 2023, and secured a job and housing.

7.

{¶ 34} Mother had an extended visit with D.W. and C.W., despite four calls to 911 between August 2023 and November 2023, and was approaching reunification with the children until the November 21, 2023 incident occurred. The police report of the incident showed that mother was so intoxicated she could hardly stand or speak, she could not give a statement to police, and she put her oldest child in a headlock and pulled the child to the ground in front of the police. Mother and the oldest child were arrested and taken to jail. LCCS learned of mother's arrest and the children were returned to LCCS's temporary custody.

{¶ 35} Upon the children's return to LCCS custody, they exhibited concerning behaviors including moaning in a sexualized manner, being defiant and destructive, hitting the foster parent and the dog, refusing to follow directions, humping random objects and openly masturbating. LCCS and the GAL then learned that a man named Charles was purportedly co-sleeping in the bed with the children at mother's house, and mother's oldest child was residing in the home.

{¶ 36} Mother consistently attended visits with the children and she was appropriate most of the time. All of the children visited with mother at the same time. Mother had to be redirected when two children were in disputes which turned physical before she intervened. There were also allegations that early in the case, mother engaged in parental alienation against father by coaching two of the children to not visit father. At the end of the visit held the day before the second day of the hearing, mother hugged

8.

D.W. and whispered in his ear but was told to stop. Mother raised her voice and was asked to leave the visit. D.W. expressed that the visit was not the best.

{¶ 37} LCCS's main concern with mother was that she was not able to provide the children with ongoing safe care. Despite case plan services designed to remedy the issues which caused the children's removal, mother demonstrated a lack of behavioral changes. Another concern was the family's long history with LCCS.

**Father**

{¶ 38} Jerik testified to the following regarding father. Father failed to establish paternity of C.W. and failed to complete the observation part of his parenting classes. Father did complete other case plan services, including a domestic violence program, in August 2024, and a parenting empowerment course, in October 2024. As to visits, C.W. refused to visit father because she said she was afraid of him, and R.B. started visits with father in July 2024 or so. Father had a pattern where he would show up for visits for two or three weeks, then miss two or three visits. Father did not have visits with R.B. in October 2024. R.B. was sad when father did not show up at visits and R.B. believed father did not want to see him. Father had some health issues and medical appointments which sometimes interfered with visits and case plan services.

{¶ 39} Father had a long history of domestic violence, even aside from mother, and verbally violent behavior. During a phone call, father told Jerik if LCCS gave mother custody of the children he would take matters into his own hands. This was perceived as a threat by Jerik and LCCS, so she had not been approved to go to father's

9.

house for over six months. It was also reported that he was verbally aggressive toward mother after the criminal case concluded. LCCS wanted to see father nonviolent and change his behavior.

{¶ 40} Father also had issues with drinking and disclosed to Jerik that he had sclerosis of the liver and wanted to cut back on his alcohol use. Jerik visited father in jail after he was arrested in April 2024 and charged with aggravated robbery. He was under the influence when he committed the crime and said it would never have happened if he were sober. Father's charge was reduced to trespass, a first-degree misdemeanor, and he was sentenced to community control.

{¶ 41} Jerik asked father to go for a drug screen at the end of September 2024, and he tested positive for alcohol and THC. Father was also asked at the beginning of October 2024 to go for a drug screen but he did not. Most of father's drug screens were no-shows, but the two or three drug screens he took were positive for alcohol and THC.

**D.W.**

{¶ 42} Jerik testified to the following with respect to D.W. Since the start of the case, D.W. lived in mother's home, dad's home and two foster homes and attended four different schools. The first foster home closed, so D.W. was sent on an extended visit at mother's home for about two and a half months, until the end of November 2023, when mother was arrested. D.W. was then placed in the second foster home where he stayed until May 24, 2024, at which time he went with dad for an extended visit. At the new school D.W. attended while living with dad, an individualized education plan ("IEP")

10.

was established. Jerik had monthly home visits with D.W. at dad's house. D.W. did not disclose any issues with dad, although mother told Jerik, in August 2024, there were some conflicts between D.W. and dad.

{¶ 43} On September 16, 2024, dad dropped D.W. off at the courthouse and left. That afternoon, LCCS held a staffing, and the initial discussion was to send D.W. to mother's home, but that was deemed inappropriate due to the pending motion for permanent custody of R.B. and C.W. It was decided that LCCS would seek permanent custody of D.W., which really upset him. Mother was with D.W. at the agency and comforted him. Later that evening, D.W. was placed at Safety Net for three days then he returned to the second foster home and was able to go to the same school that he had attended when he was previously in that foster home.

{¶ 44} Jerik visited D.W. a couple of times after D.W. returned to the second foster home and D.W. "was doing really well. . . They're happy to have him and he's happy to be there." Regarding school, D.W. had struggled but was making progress and doing well, his IEP was updated, he was enrolled in sports and "[i]t was reported that the kids were very excited to see him back at school."

{¶ 45} D.W. participated in counseling and was successfully discharged.

**R.B.**

{¶ 46} Jerik testified to the following regarding R.B. Since the start of the case, R.B. was placed in five foster homes and switched schools three times. After each move,

11.

there was an increase in R.B.'s behaviors until he adjusted. R.B. did not do well with change.

{¶ 47} R.B.'s first foster home was an emergency placement from September 29 to 30, 2022. He was in the second foster home from September 30 to October 15, 2022. There was a conflict between the foster children, so R.B. was placed with his siblings in the third foster home from October 15, 2022, to January 24, 2023. Due to R.B.'s behavior, he was placed in the fourth foster home, from January 24 to December 22, 2023. C.W. was also placed in that foster home for about one month. She had some behaviors which sparked R.B. to have behaviors like destroying property, bad language, being very defiant, not following rules, hitting the foster parent, hitting the dog, being difficult about going to school and sexualized behaviors. R.B. was placed in his fifth and current foster home on December 22, 2023. R.B. had some defiant behaviors but his foster mother worked with him. He was stable and the foster mother was wonderful with him. She gave him the structure he needed and took him to all of his appointments. R.B. was bonded with the foster mother, although not as bonded as he was with mother, and he believed he was in a safe place.

{¶ 48} R.B. had individual counseling, case management, an assessment to determine if extra services would be beneficial, and he was tested for and diagnosed with autism. He was also diagnosed with ADHD, oppositional defiant disorder and trauma related disorder. In addition, R.B. has seizures and developmental delays.

12.

{¶ 49} R.B. and C.W. both had sexualized behaviors after they left mother's care at the end of November 2023, like humping things, humping the air and making sexualized moaning sounds. A foster parent told Jerik about the children co-sleeping/sharing a bed with "Charles" at mother's home. R.B. had some behaviors and issues before he was removed, but there were no reports of him sexually acting out before November 2023.

{¶ 50} R.B.'s birthday was in early October and there were discussions that R.B. wanted to pick up cupcakes and bring them to his visit with mother but there was no visit because mother was ill. Although mother did visit with R.B. other times in October 2024, she did not bring him a birthday gift; R.B. had an issue with that. R.B. had an outburst at school then refused to get on the bus and ran in front of the bus. He kicked and screamed and after several hours, the police were called and were eventually able to get R.B. in a car and back to his foster home. There, R.B. opened a window and threatened to jump out. He also grabbed a hanger and said he would stab himself. R.B. was hospitalized for several days due to suicidal ideations and was released just before the second day of the hearing. During a visit, D.W. kept asking R.B. why he was hospitalized and at the end of the visit, mother raised her voice and was asked to leave, which was frustrating for R.B., and he had some problems leaving the building that day. Jerik believed that missing visits and things that happened at visits could contribute to R.B.'s mental health issues.

13.

**C.W.**

{¶ 51} Jerik testified to the following with respect to C.W. During the case, C.W. was in four placements, and attended four different schools. C.W. was in the first foster home from September 29, 2022 to mid-September 2023, when she left for an extended visit at mother's home. C.W. was removed from mother's home in November 2023, and from that time until December 13, 2023, C.W. was in a second foster home, which was also R.B.'s foster home. C.W. did not adjust well after she left mother's home and C.W. openly masturbated in the living room and had other sexualized behaviors, she destroyed property, was defiant and used lots of inappropriate language. There was an emergency placement for C.W. from December 13 to 17, 2023. After that, C.W. was placed in her last foster home, where she was very bonded to her foster parent, she had been on family vacations and she was very comfortable and relaxed in the foster home.

{¶ 52} C.W. attended counseling, which was on-going. C.W. did not have sexualized behaviors until after she left mother's care at the end of November 2023.

**GAL**

{¶ 53} Robin Fuller testified to the following. She was appointed GAL for the children on October 25, 2022. She conducted an investigation, including interviewing witnesses and reviewing documents, and authored a report. She recommended that permanent custody of all three children be awarded to LCCS.

{¶ 54} Fuller had concerns with mother due to the oldest child living with mother, as mother was told the oldest child could not live with her. Fuller asked mother many

14.

times if the oldest child lived there, but mother always denied it. Every time Fuller went to mother's home, the oldest child was there, and Fuller saw the oldest child in bed with the children. Also, the children told Fuller that the oldest child lived in mother's home.

{¶ 55} Another concern had to do with Charles, who the children mentioned to Fuller and said they met him. There were allegations that Charles stayed the night at mother's home and slept in the same bed with the children. Fuller asked mother about Charles and mother said it was none of Fuller's business, that Fuller did not need to know who was coming to the house and Charles did not want to be involved.

{¶ 56} Fuller saw changes with mother's behavior over the course of the case. Mother was angry at the beginning but did her services and talked a lot with Fuller. When the children were at mother's home, mother's attitude changed. Fuller thought mother was doing fantastic until the November 2023 incident, when mother and the oldest child got into a fight, and when Fuller heard about Charles. Then, there was the incident in June 2024, where police were called to mother's home because of the oldest child, who was living at mother's house. Fuller was concerned about the violence. In addition, when mother had Level 2 visits with the children, R.B. and C.W. were unmanageable, angry, broke things, and tried to attack the foster mothers after they returned to the foster homes. After visits were moved to Level 1, R.B. and C.W. did not have those issues.

{¶ 57} With respect to father, Fuller wanted to see him "step up his game . . . [h]e's had two years. If you want your kids back so bad, do the IOP. Do what you have

to do to get your kids back."  Father had health issues, "according to [him]."  It took over two years and father was just finishing his case plan services. . . and there were "[n]o-shows with the kids. . . [R.B.] has fought to see [father] and gotten angry when the no-shows started happening.  And [R.B.] has a hard enough time handling things."  During a phone call, father became kind of threatening with Fuller when he said he would do what he had to do to get his children back and he was not afraid to go to jail.

{¶ 58} Regarding the children, D.W. was a very good kid, laid back, patient and calm but he did not open up very much.  He was upset when dad left him at the courthouse, but D.W. acted appropriately.  D.W. was doing great and until recently, wanted to return to mother's home.  He told mother he wanted to stay at his foster home as he was very bonded with his foster parents, he was going to school and loved basketball.  Fuller believed that at the foster home, D.W. could be a kid and did not have to deal with chaos.

{¶ 59} Fuller had concerns about R.B., who had a lot of issues.  He wanted all of the attention wherever he was, yet mother was very patient with R.B. at visits.  R.B. was very upset when mother did not get him anything for his birthday, which was before he went into the hospital.  R.B. loved mother and wanted to go home with her.  R.B. also loved father and was very loyal to father.  R.B. wanted to see father and got mad when father did not come to visits.

{¶ 60} C.W. was very shy and it took her a while to warm up and open up to someone.  She was very happy in her foster home.  There was another little girl in the

16.

foster home and C.W. was bonded with her and they were like two little sisters. The foster family was interested in adopting C.W. Throughout the case, C.W. was consistent that she was afraid of father, although Fuller witnessed a time where C.W. started to say that she wanted to see father but R.B. elbowed C.W. and said something like "'remember you don't like him, and you are scared of him.'" This occurred before mother had Level 1 visits. Fuller was concerned mother coached the children.

{¶ 61} Fuller did not believe father did what he should have and what was needed to properly parent the children. Fuller thought if the children were returned to mother, the oldest child would come back, and the cycle would start all over again.

**Mother**

{¶ 62} Mother testified to the following. She wanted to be reunited with her children. She had a job and housing which was big enough for the three children.

{¶ 63} In September 2024, after dad left D.W. at the courthouse, mother was with D.W. to calm him down, and at one point he ran away, and she went after him and found him. Mother said the agency told her D.W. could not come to her home because her oldest child, who was 23 years old, was a danger to the children. Mother said her oldest child lived out of town with her father. Recently, D.W. told mother he wanted to stay at the foster home because he was tired of switching schools. D.W. understood that he would be adopted if he stayed with the foster family.

{¶ 64} When R.B. acted out, he screamed "real bad" and to deescalate the situation, mother gave him a time out or had him sit in a corner.

17.

{¶ 65} Mother's visits with the children went very well and they played cards, ate, hugged and kissed.

{¶ 66} Mother was asked if she had been arrested and charged with assault, and she said she had. She was asked when that occurred, she responded, "The most recent?" She said it was the September 2022 incident with father. She explained when she was arrested in November 2023, it was the middle of the night, and the children were sleeping.

{¶ 67} Mother was asked how she intended to keep a relationship with her oldest child if the children were returned and mother said, "I don't have to be in full compliance with the Agency because I don't want anything, you know. . . The plan is to stick with the plan that we have now. She understands that she can't be around the kids." Mother said her oldest child was getting help for her issues and was in anger management.

**Father**

{¶ 68} Father testified to the following. He did not establish paternity of C.W. because he was stressed and depressed. Jerik called him before the second day of the hearing and father learned that since he had not established paternity, he would not have a say-so regarding C.W., so he contacted welfare to set up a paternity test.

{¶ 69} Regarding case plan services, he was told for six to eight months that he could not do services because "the lady that did [his] dual assessment said that [he] needed classes, but she told [him] and [his] fianc[é]e twice in [his] face that [he] never needed no classes." Jerik contacted father and told him "the lady said [he] needed to do

18.

IOP." Father explained the situation "[a]nd refused to do it because [he] don't have a drug problem." Jerik told father he could not do services unless he did IOP.

{¶ 70} Father said "[a]lcohol became an issue after all of that with the assessment. That's when it became an issue." He posted about his drinking on Facebook. Father never did IOP and said he resolved his alcohol issue on his own. Eventually the agency allowed him to do services even though he did not do IOP. He started domestic violence classes in December 2023 and finished in August 2024. It took so long because of his "back issue and stuff going on with [his] health so [he] took care of that first."

{¶ 71} Father said his relationship with R.B. and C.W. was good. He was "a little stern, more stern than others." R.B. and C.W. lived with him in 2021, for two months "until [s]omebody decided to put some false charges on [him] and [he] got arrested for them, and then they gave the kids back to [his] baby mother." R.B. and C.W. also lived with father for three months in 2022, until the agency took them. Thereafter, R.B. and C.W. refused to see him. Father believed the children were coached by mother to say they did not want to see him. He eventually visited R.B. but had to stop because he could not sit on the hard plastic.

{¶ 72} Father said he was not violent, "[b]ut at the end of the day if you mess with [his] kids, [his] money. . . [he] don't try to walk away from a lot of things. People tend to antagonize [him]. Push buttons and put their hands on you, and you have to do what you have to do." Father had a pending case for aggravated menacing.

19.

{¶ 73} Father visited R.B. at the hospital and R.B. said he wanted to live with father. Father asked R.B. what caused him to be in the hospital, but R.B. shut down.

{¶ 74} Father heard Jerik say that she needed to see a change in his behavior and when asked what he understood that meant, he replied, "the thing is everyone is just looking at [his] record, okay. [He] made mistake[s] in [his] life. . . [He] knows[s] that [he's] done some stupid things. [He was] human, but it does not reflect [him] being a parent at all. So they're looking at [his] record as a behavior, or at times [he] went off on Children Services." Father said he threatened to sue LCCS, but he did not threaten the caseworker. He wanted to sue "on the basis of the allegations on why they took [his] kids is baloney."

{¶ 75} Father learned a whole lot from his case plan services, like to keep his cool and composure and "to do the best you can to keep Children Services out of your life."

{¶ 76} Father thought it was in R.B. and C.W.'s best interest to be with him because he was in the process of buying a house and remodeling it, he was about to start a podcast, he had a strong support system, R.B. and C.W. got along well with his fiancée, he started a small business, and parenting classes and the experience taught him to be calmer. He said he was able to finish his parenting classes because there were cushioned chairs "that [he] could actually sit in and be comfortable in." Father wanted more time to show that he was changing. He said he was a different person, and he quit smoking and drinking.

20.

## Permanent Custody Law

{¶ 77} The juvenile court may grant permanent custody of a child to a children services agency if the court finds, by clear and convincing evidence, two statutory prongs: (1) the existence of at least one of the factors set forth in R.C. 2151.414(B)(1)(a) through (e), and (2) the child's best interest is served by granting permanent custody to the agency. *In re M.B.*, 2005-Ohio-986, ¶ 6 (10th Dist.); R.C. 2151.353(A)(4).

### First Prong

{¶ 78} The relevant provisions of R.C. 2151.414(B)(1) state:

[T]he court may grant permanent custody of a child to a movant if the court determines . . . by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody . . . to the agency . . . and that any of the following apply:

(a) The child is not abandoned or orphaned, has not been in the temporary custody of one or more public children services agencies . . . for [12] or more months of a consecutive [22]-month period . . . and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.
. . .

(d) The child has been in the temporary custody of one or more public children services agencies . . . for [12] or more months of a consecutive [22]-month period, or the child has been in the temporary custody of one or more public children services agencies . . . for [12] or more months of a consecutive [22]-month period[.]

{¶ 79} With respect to R.C. 2151.414(B)(1)(d), when calculating "12 of 22" time, the operative beginning date (when the child is considered to have entered the temporary custody of an agency) is the earlier of the date of the adjudication or 60 days after the removal of the child from the home. *In re A.C.*, 2006-Ohio-3337, ¶ 11 (9th Dist.). The

21.

operative ending date is the date the motion for permanent custody was filed. *Id.* at ¶12, citing *In re C.W.*, 2004-Ohio-6411, ¶ 24 ("'[A] motion for permanent custody must allege grounds that currently exist.' *In re K.G.*, 2004-Ohio-1421[,] . . . ¶ 13 [(9th Dist.)].") R.C. 2151.414(B)(1)(d) does not require 22 months of agency involvement before an agency seeks permanent custody of a child, it only requires that the child has been in an agency's temporary custody for 12 or more months of a consecutive 22-month period. *In re N.M.P.*, 2020-Ohio-1458, ¶ 22-24.

{¶ 80} With respect to R.C. 2151.414(B)(1)(a), R.C. 2151.414(E) sets forth the elements necessary to satisfy a determination that the child cannot or should not be placed with either parent within a reasonable time. *See In re Schaefer*, 2006-Ohio-5513, ¶ 38. Here, the juvenile court found that R.C. 2151.414(E)(1), (2), (4) and (16) applied, which provisions state:

> (1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.
>
> (2) Chronic . . . chemical dependency of the parent that is so severe that it makes the parent unable to provide an adequate permanent home for the child at the present time and, as anticipated, within one year after the court holds the hearing pursuant to division (A) of this section[;]
> . . .

22.

(4) The parent has demonstrated a lack of commitment toward the child by .
. . actions showing an unwillingness to provide an adequate permanent
home for the child;

. . .

(16) Any other factor the court considers relevant.

**Second Prong**

{¶ 81} To satisfy the second prong, the agency must establish, by clear and

convincing evidence, that permanent custody of the child to the agency is in the child's

best interest based on an analysis under R.C. 2151.414(D).  The R.C. 2151.414(D)(1)

factors are:

(a) The interaction and interrelationship of the child with the child's
parents, siblings, relatives, foster caregivers and out-of-home providers, and
any other person who may significantly affect the child;
(b) The wishes of the child, as expressed directly by the child or through
the child's guardian ad litem, with due regard for the maturity of the child;
(c) The custodial history of the child, including whether the child has been
in the temporary custody of one or more public children services agencies
or private child placing agencies for twelve or more months of a
consecutive twenty-two-month period . . . ;
(d) The child's need for a legally secure permanent placement and whether
that type of placement can be achieved without a grant of permanent
custody to the agency;
(e) Whether any of the factors in divisions (E)(7) to (11) of this section
apply in relation to the parents and child.

{¶ 82} Clear and convincing evidence requires proof which "produce[s] in the

mind of the trier of facts a firm belief or conviction as to the facts sought to be

established." *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus.

In order to determine whether a juvenile court based its judgment on clear and convincing

evidence, the reviewing court examines the record to decide whether the trier of fact had

23.

sufficient evidence before it to satisfy the appropriate degree of proof. *State v. Schiebel*, 55 Ohio St.3d 71, 74 (1990).

**Judgment Entry**

{¶ 83} The juvenile court found, by clear and convincing evidence, that the children cannot or should not be placed with either parent within a reasonable time, in accordance with R.C. 2151.414(B)(1)(a), and the children were in LCCS's temporary custody for 12 or more months of a consecutive 22 months, in accordance with R.C. 2151.414(B)(1)(d). The court also found, by clear and convincing evidence, that a grant of permanent custody to LCCS was in the children's best interest, under R.C. 2151.414(D). The court therefore granted LCCS's motion for permanent custody.

{¶ 84} The court found, as to mother and father, under R.C. 2151.414(E)(1), despite reasonable case planning and diligent efforts by LCCS to assist to remedy the problems that initially caused the children to be removed, mother and father failed continuously and repeatedly to substantially remedy those conditions, as mother and father did not utilize the medical, psychiatric, psychological, and other social and rehabilitative services and material resources which were made available to them.

{¶ 85} The court found that mother completed all her case plan services, but LCCS had ongoing concerns for her ability to provide a safe and stable residence for the children. The court agreed with LCCS, observing that after the children were returned to mother's care on an extended stay, she became intoxicated and engaged with her oldest child, so police were called. Officers responded and observed mother could hardly stand

24.

or speak and she put her oldest child in a headlock. The GAL testified that mother and her oldest child had a contentious relationship throughout the life of the case. Mother testified she learned several coping tools in her domestic violence courses, but when asked what she would use to deescalate a situation with her oldest child other than walking away, mother did not provide the court with a compelling answer that would demonstrate that she learned anything more than the ability to walk away from a potentially violent situation.

{¶ 86} The court further found that while father did not complete his case plan services, he made strides after the motion for permanent custody was filed and he completed two services prior to the second day of the hearing. However, he did not demonstrate any behavior change. The court noted the hearing had been continued so father could address his pending aggravated burglary charge, and there was ample testimony that it was recommended that he engage in substance use treatment, but he declined to do so. Father admittedly had an alcohol issue that remained unaddressed for two years, then two weeks before the second day of the hearing, he posted on Facebook he was sober for two weeks.

{¶ 87} The court also found, under R.C. 2151.414(E)(2), father suffered from such severe chemical dependency that he was unable to provide an adequate permanent home for the children at the present time, and it was highly unlikely that he would remedy his chemical dependency within one year from the trial date.

25.

{¶ 88} The court further found, under R.C. 2151.414(E)(4), that mother and father demonstrated a lack of commitment toward the children by failing to regularly support, visit or communicate when able, or by other actions showing an unwillingness to provide an adequate permanent home. Neither parent demonstrated the necessary changes in their parental conduct to resume their parental obligations which demonstrated an unwillingness to provide an adequate permanent home for the children.

{¶ 89} The court further found, under R.C. 2151.414(E)(16), that dad shirked his parental responsibilities and committed one of the most traumatic experiences that D.W. will likely experience.

{¶ 90} The court also found, under R.C. 2151.414(B)(1)(d), that the children were in LCCS's temporary custody for more than 12 months of a consecutive 22-month period.

{¶ 91} The court further found that LCCS provided clear and convincing evidence that a grant of permanent custody was in the children's best interest. The court considered R.C. 2151.414(D)(1)(a) through (e) factors and set forth its analysis. The court discussed the children's love for their parents, but observed the testimony established how each parent negatively impacted the children. Mother allegedly attempted to coach R.B. and C.W. to not appear for visits with father and initially, R.B. refused to visit father, but later began visits while C.W. refused to visit father throughout the case. Dad completely gave up on D.W. by dropping him off at the courthouse on September 16, 2024.

26.

{¶ 92} The court described the tumultuous time the children had while in out-of-home care, and how each child had multiple placements while in LCCS's extended temporary custody. Notwithstanding, for the past year, R.B. and C.W. experienced some stability in their placements, and D.W. was placed with his prior foster family with whom he has a good relationship. R.B. and C.W. expressed that they would like to return to mother's care, contrary to the GAL's recommendation, and D.W. advised the GAL and mother that he would like to stay with his foster family, who considered adopting D.W. and C.W.

{¶ 93} The court found LCCS searched for relatives to take in the children, but there were none. The court therefore found that a legally secure permanent placement for the children could not be achieved without a grant of permanent custody to LCCS.

**Standard of Review**

{¶ 94} In *In re Z.C.,* 2023-Ohio-4703, the Supreme Court of Ohio clarified the standard of review in permanent custody cases, and held:

> Given that R.C. 2151.414 requires that a juvenile court find by clear and convincing evidence that the statutory requirements are met, we agree with those appellate courts that have determined that the sufficiency-of-the-evidence and/or manifest-weight-of-the-evidence standards of review are the proper appellate standards of review of a juvenile court's permanent-custody determination, as appropriate, depending on the nature of the arguments that are presented by the parties.

*Id*. at ¶ 11.

{¶ 95} Sufficiency of the evidence and manifest weight of the evidence are "distinct concepts and are 'both quantitatively and qualitatively different.'" *Id*. at ¶ 13, quoting *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 10, quoting *State v. Thompkins*, 78 Ohio 27.

St.3d 380, 678 (1997), paragraph two of the syllabus. "We have stated that 'sufficiency is a test of adequacy,' . . . while weight of the evidence 'is not a question of mathematics, but depends on its effect in inducing belief.'" (Emphasis sic.) *Id.*, quoting *Thompkins* at 387, quoting Black's Law Dictionary (6th Ed. 1990). *See also In re E.C.*, 2024-Ohio-281, ¶ 71-73 (6th Dist.).

**First Assignment of Error**

{¶ 96} Mother argues the juvenile court's decision to terminate custody of her children was an abuse of discretion and/or not supported by the manifest weight of the evidence. She contends she completed all of her case plan services, visited regularly with her children and her two youngest children always asked to live with her.

{¶ 97} Mother acknowledges the juvenile court may grant permanent custody of a child to the agency if a child has been in its temporary custody for 12 of 22 months, pursuant to R.C. 2151.414(B)(1)(d), and the court correctly found that her children were in LCCS's temporary custody for at least 13 months. However, she asserts the court's reliance on the "12 of 22" provision was misplaced because LCCS was not required to file for permanent custody after 12 months of temporary custody of the children. She contends it was an abuse of discretion by the court and/or the agency to refuse to offer an extension of temporary custody "for the purpose of allowing further investigation into the unarticulated concerns that mother was 'unsafe' due to the occasional presence of her [oldest child]." Mother cites to, inter alia, R.C. 2151.45(D)(1).

28.

{¶ 98} Mother argues her relationship with her oldest child was construed as detrimental to the children, due to her oldest child's history of mental health issues and domestic incidents, but it was disputed how often the oldest child was at mother's home, so LCCS did not prove by clear and convincing evidence that the oldest child lived at mother's home. Mother further submits it was undisputed that her oldest child was in a domestic violence incident with a boyfriend during this case, but it did not involve mother or the other children and it did not happen at mother's home or in front of the children.

{¶ 99} Mother also asserts LCCS did not prove, by clear and convincing evidence, that she failed to substantially remedy the conditions causing the children's removal. She contends the children were removed due to an incidence of violence where she assaulted father, she was charged with felonious assault and resolved the case by pleading to aggravated assault. She was sentenced to two years of community control, which was terminated early due to her compliance. She claims that "[w]ithout new charges filed during the pendency of the case, following the resolution of the original charges," she did indeed substantially remedy the conditions which caused the children's removal.

{¶ 100} In addition, mother argues no evidence was presented that she failed to support, communicate or visit with the children, or was otherwise unwilling to support them. She asserts she completed her case plan services including visiting the children regularly, obtaining employment and maintaining stable housing, and her drug screens were clean. While "[t]he agency continued to express concerns that mother could not

provide a 'safe' home, . . . the concerns all centered on [mother's oldest child]," mother testified her oldest child lived with her father in Sandusky, Ohio. Mother insists LCCS did not prove, by clear and convincing evidence, that mother's oldest child posed any kind of threat to the children's safety.

## Analysis

{¶ 101} Upon review of the arguments presented by mother, we find the manifest weight of the evidence standard applies to our examination of the juvenile court's decision.

### First Prong of the Permanent Custody Test

{¶ 102} The juvenile court found R.C. 2151.414(B)(1)(a) and (d) applied.

{¶ 103} Regarding R.C. 2151.414(B)(1)(a), based on our review of the record, as summarized above, we conclude there is clear and convincing evidence in the record that the children cannot or should not be placed with mother within a reasonable time. The record shows that mother completed all of her case plan services, but she derived no substantive benefit as she failed to internalize or use what she was taught to change her conduct so she could keep her children safe.

{¶ 104} Mother's visits with the children at the time of the second day of the hearing were at Level 1, due to behaviors the children had when mother's visits were at Level 2, which behaviors included physical aggression between D.W. and R.B. at a visit and very disruptive behaviors by R.B. and C.W. after visits, at their foster homes. These behaviors resolved when Level 1 visits were instituted.

30.

**{¶ 105}** Mother continued her involvement with her oldest child, which led to additional police interaction. This establishes that mother did not take the necessary steps to ensure that she would be free from violent or potentially violent situations. Mother was not open with the agency about her oldest child's presence in the home, nor was mother forthcoming about Charles' presence in her home.

**{¶ 106}** Mother's failure to comprehend the consequences of her choices is demonstrated by her poor judgment in allowing her children to be exposed to risky behavior and unsafe people in mother's own home. Thus, the evidence reveals that mother did not remedy the issues which caused the children's removal, which shows a lack of commitment to the safety and wellbeing of the children.

**{¶ 107}** We also conclude there is clear and convincing evidence in the record to support the juvenile court's decision, under R.C. 2151.414(B)(1)(d), that the children were in LCCS's temporary custody for at least 12 months of a consecutive 22-month period.

**{¶ 108}** We therefore find the first prong of the permanent custody test satisfied.

**Second Prong of the Permanent Custody Test**

**{¶ 109}** The juvenile court found that granting permanent custody of the children to LCCS was in their best interest. The court considered: the interaction and relationships of the children with, inter alia, mother, father, dad and caregivers; the wishes of the children as expressed by the GAL, caseworker, children and children's

31.

attorney; the children's custodial history; and the children's need for a legally secure permanent placement.

{¶ 110} Our review of the record shows the three children have all been in multiple placements and schools since their removal, which has been difficult on them. At the time of the second day of the hearing, the children were all in foster homes where they were comfortable, safe, bonded with their foster parents and foster families and all their needs were met, including R.B.'s special needs.

{¶ 111} The three children love each other and mother very much. R.B. and C.W. desired to return to mother's care, as expressed by their attorney. D.W. wished to stay in his foster home. The GAL and caseworker both recommended that it was in the children's best interest for permanent custody to be awarded to LCCS, as reunification of the children with mother could not occur in a timely manner and a legally secure permanent placement could not be achieved without a grant of permanent custody to LCCS. We conclude the juvenile court had before it clear and convincing evidence that granting permanent custody to LCCS was in the children's best interest.

{¶ 112} We therefore find the second prong of the permanent custody test satisfied.

{¶ 113} In light of the foregoing, we conclude the juvenile court's judgment, as it relates to mother, which granted permanent custody of the children to LCCS, is supported by clear and convincing, credible evidence and is not against the manifest weight of the evidence. Accordingly, the first assignment of error is not well-taken.

32.

{¶ 114} Father argues the juvenile court's decision to terminate custody of his two children was an abuse of discretion, and/or was not supported by the manifest weight of the evidence. He asserts he completed all of his case plan services and was not the party responsible for the removal of the children. He contends, regarding the 12 of 22-month provision, that the refusal to offer an extension of temporary custody so he could continue to visit with R.B., attempt to visit C.W., complete the paternity test and address other agency concerns was an abuse of discretion and/or not supported by the manifest weight of the evidence. He also submits that LCCS did not prove, by clear and convincing evidence, that he abandoned the children or had a chemical dependency so severe that he could not provide a stable home for the children.

{¶ 115} Father claims that despite testimony that he was slow to complete a paternity test for C.W., the agency treated him as the father throughout the case, including offering him case plan services and no evidence was presented that he was not the legal father of C.W.

{¶ 116} Father further contends, notwithstanding the juvenile court's representation to the contrary, "the agency testified that Father Bragg completed his case plan services," which included: a dual assessment, which recommended IOP and detox; a domestic violence batterers program; and a parenting program. He claims the only part of the case plan that was construed negatively against him was his inconsistent visitation with his children. He notes there were stretches of time when he did not visit, but he had

33.

significant health concerns and the children did not want to visit with him, "with an underlying allegation that the children were being coached to avoid visiting with him, early in the case." He maintains he visited the children when he could and when they wanted to see him.

{¶ 117} Father further asserts he did not fail to remedy the conditions which caused the children to be removed because he was the victim of the incident, he was not charged, and arguably did not cause the situation which resulted in the removal of the children. He observes the GAL report suggested that he and mother were both drinking when the situation occurred, but he submits there was testimony that he addressed his drinking, and there was no evidence at trial that he suffered from such a severe chemical dependency that he was unable to provide an adequate permanent home for his children as "[t]here were . . . no new DUI's, or criminal charges associated with drug use or possession, allegations of drunken brawls or inappropriate intoxication."

{¶ 118} Father also submits that he did not accrue any serious criminal charges during the pendency of the case, as the evidence showed he had seven charges dismissed since 2019, "with two resulting convictions for disorderly conduct, and one charge which resulted in probation." Father maintains LCCS did not prove "an imputed 'history of violence.'"

{¶ 119} Lastly, father argues "there was arguably no evidence presented that [he] was simply unwilling to visit with the children or otherwise support or communicate with them" or unwilling to provide an adequate permanent home. He asserts that while his

34.

visits were sometimes inconsistent, the reasons were a lack of interest by the children and his unavailability due to his numerous, serious physical ailments.

**Analysis**

{¶ 120} Upon review of the arguments presented by father, we find the manifest weight of the evidence standard applies to our examination of the juvenile court's decision.

**First Prong of the Permanent Custody Test**

{¶ 121} The juvenile court found R.C. 2151.414(B)(1)(a) and (d) applied.

{¶ 122} Regarding R.C. 2151.414(B)(1)(a), the juvenile court found that R.B. and C.W. cannot or should not be placed with father within a reasonable time. Based on our review of the record, as summarized above, we conclude there is clear and convincing evidence in the record to support the juvenile court's decision. The record reveals that father has long-standing issues with alcohol and violence, he has an extensive criminal history, and he was arrested and in jail during the pendency of the case.

{¶ 123} The record further shows that despite case plan services offered to father by LCCS to assist him in remedying the issues which caused R.B. and C.W. to be removed, he failed to make significant progress. He was initially noncompliant with services, other than undergoing a dual assessment and detox assessment, due to health issues and being discouraged that the children were in foster care. Then, in late 2023 or early 2024, before LCCS filed for permanent custody of R.B. and C.W., father started his services. Yet, during that time, he was arrested and charged with a felony. At the first

35.

day of the hearing, his counsel represented to the juvenile court that father was not seeking custody of R.B. and C.W. By the second day of the hearing, father wanted custody of R.B. and C.W., and had finished most of his case plan, but his visits with R.B. were not consistent, and visits with C.W. were nonexistent, and father failed to show a change in his behavior. Moreover, father did not comply with most of LCCS's requests for drug screens and the few screens that he took, he tested positive for alcohol and THC.

{¶ 124} Father's failure to alter his behavior demonstrates that he did not remedy the issues which caused R.B. and C.W.'s removal, which shows a lack of commitment to the safety and wellbeing of R.B. and C.W.

{¶ 125} We also conclude there is clear and convincing evidence in the record to support the juvenile court's decision, under R.C. 2151.414(B)(1)(d), that R.B. and C.W. were in LCCS's temporary custody for at least 12 months of a consecutive 22-month period.

{¶ 126} We therefore find the first prong of the permanent custody test satisfied.

**Second Prong of the Permanent Custody Test**

{¶ 127} The juvenile court found that permanent custody of R.B. and C.W. to LCCS was in their best interest. The court considered: the interaction and relationships of R.B. and C.W. with, inter alia, father, mother and caregivers; R.B. and C.W.'s wishes as expressed by R.B. and C.W., the GAL, caseworker and children's attorney; R.B. and C.W.'s custodial history; and R.B. and C.W.'s need for a legally secure permanent placement.

36.

{¶ 128} The record shows that when LCCS became involved, the children were not enrolled in school and R.B. had numerous issues with his development, health and behaviors. Since their removal from father and mother, R.B. and C.W. were in multiple placements and schools, which transitions were not easy for them. By the second day of the hearing, the evidence showed that R.B. and C.W. were in stable environments in their foster homes, they were bonded with their foster families, their issues were being addressed, and their behaviors had improved. There was also evidence that R.B. was disappointed in father for not always attending visits and C.W. was afraid of father and did not want to see him. The GAL and caseworker both recommended that it was in R.B. and C.W.'s best interest for permanent custody to be awarded to LCCS, as reunification of R.B. and C.W. with father could not occur in a timely manner and a legally secure permanent placement could not be achieved without a grant of permanent custody to LCCS.

{¶ 129} In light of the foregoing, we conclude the juvenile court's judgment, as it relates to father, which granted permanent custody of R.B. and C.W. to LCCS, is supported by clear and convincing, credible evidence and is not against the manifest weight of the evidence.

{¶ 130} We therefore find the second prong of the permanent custody test satisfied.

{¶ 131} Accordingly, the second assignment of error is not well-taken.

37.

**{¶ 132}** On consideration whereof, the judgment of the Lucas County Court of Common Pleas, Juvenile Division, is affirmed.  Appellants are ordered to pay the court costs of this appeal pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Thomas J. Osowik, J.          _____

JUDGE

Christine E. Mayle, J.     

Myron C. Duhart, J.         _____
CONCUR.                             JUDGE

_____

JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions.  Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.