[Cite as *In re L.R.*, 2026-Ohio-746.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

In re L.R., D.B., K.B., Ezi.T., Eze.T.,
Erie.T., Eria.T.

Court of Appeals No. {48}L-25-00227

Trial Court No. 23296502

**DECISION AND JUDGMENT**

Decided: March 5, 2026

* * * * *

Emily McGill, for appellee.

Laurel A. Kendall, for appellant.

* * * * *

**OSOWIK, J.**

**{¶ 1}** This is an expedited appeal from the judgment by the Lucas County Court of

Common Pleas, Juvenile Division, which granted appellee Lucas County Children

Services legal custody in a planned permanent living arrangement for L.R. (17-year-old

child No. 1); terminated the parental rights of appellant-Mother S.M. to six of her nine

children, D.B. (15-year-old child No. 2), K.B. (14-year-old child No. 3), Eria.T. (10-year-

old child No. 4), Ezi.T. (nine-year-old child No. 5), Eze.T. (seven-year-old child No. 6),

and Erie.T. (six-year-old child No. 7); and granted appellee permanent custody of child Nos. 2 through 7.[1] J.R., the alleged father of child No. 1; J.B., the alleged father of child Nos. 2 and 3; and E.T., Mother's legal husband and the legal father of child Nos. 4, 5, 6, and 7, whose parental rights were also terminated, did not appeal the judgment, and we will limit our discussion below to Mother. For the reasons set forth below, this court affirms the juvenile court's judgment.

## I. Background

{¶ 2} The following facts are relevant to this appeal. On October 3, 2023, appellee filed a complaint against Mother alleging, under R.C. 2151.04, dependency of child Nos. 1 through 7.

{¶ 3} In April, 2023, Mother was referred to appellee due to the lack of stable housing where Mother lived with the seven children in a home with no working utilities and using electricity from a neighboring home. That situation was initially resolved without formal juvenile court involvement when the children began to live with E.T. At this point in July 2023, both Mother and E.T. had a written, appellee-approved agreement for E.T.'s temporary possession of the seven children while Mother continued to search for stable housing and employment. The juvenile court described this arrangement as "a

---

[1] At some point after the complaint was filed, the juvenile court changed the listing of the children in its journal entries. By the time of its judgment on September 12, 2025, the juvenile court listed child No. 4 as child No. 7, child No. 5 as child No. 4, child No. 6 as child No. 5, and child No. 7 as child No. 6. This opinion will use a child's numerical designation as originally listed in the complaint.

2.

voluntary case in which the children were not removed, and . . . the children were enrolled in school and all the children were living with [E.T.], with Mother's consent."

{¶ 4} The incident leading to the complaint occurred on September 17, 2023, when E.T. and his girlfriend, each in separate cars, took six of the children[2] to Belle Isle Park in Detroit, Michigan but left without two children in either car, and, upon returning to Toledo, reported the missing children to the Toledo Police.[3] After that incident, Mother was charged with domestic violence against E.T., and the Sylvania Municipal Court placed her on probation and ordered Mother to have no contact with him. On October 3, the juvenile court granted appellee ex parte, emergency shelter care order for temporary custody of the children.

{¶ 5} On November 20, 2023, with Mother's consent, the juvenile court adjudicated all children dependent, and then at the immediately following dispositional hearing, continued appellee's temporary custody of them. During the case, the juvenile court approved Mother's case plan services with the stated goal of reunification and ordered the following services: "complete parenting classes, complete a dual assessment and follow all recommendations, complete domestic violence services, and obtain and. maintain stable housing."

---

[2] Child No. 1 did not go to Belle Isle Park. The reason is unclear, but the record labels him "AWOL." According to the Ohio Department of Children and Youth, "AWOL" means "absent without leave." "AWOL" refers to a child placed in appellee's care who is missing from their approved placement and the child's whereabouts are unknown to appellee.
[3] That incident also prompted a neglect referral by appellee against E.T., not Mother.

3.

{¶ 6} Then in a series of judgment entries, the juvenile court granted appellee's motions to reunify the children with Mother, under appellee's protective supervision, because appellee believed that Mother had made significant progress in her case plan services, displayed changed behavior, and understood her role in protecting the children from violence. The juvenile court awarded the children's legal custody to Mother as follows: effective on June 26, 2024, for child Nos. 1, 4, 6, and 7; effective on August 15, for child Nos. 2 and 3; and effective on October 2, for child No. 5. Appellee requested these staggered reunifications so that Mother could readjust to properly caring for the demanding needs of these children, including school enrollments and individual medical appointments. Appellee also assigned a support worker to help Mother.

{¶ 7} Despite Mother's progress with her case plan services, including domestic violence survivor's services, appellee learned of a domestic violence incident on October 14, 2024, which changed appellee's belief in Mother's progress and prompted the children's second removal from home. According to the ongoing caseworker:

> The police were called to mom's home. I was not aware of this situation on October 14th because mom failed to tell me about this. I believe I found out a couple of days later. A number that I did not have saved texted me and said something happened and I need to look into it, and that the kids should not be with mom. I ran a 911 report and I requested the police report, and that's what prompted their second removal.

{¶ 8} On October 14, 2024, the Toledo Police reported the children witnessed a 20-minute domestic violence incident at Mother's home between E.T. and Mother's boyfriend. Previously, Mother had reported to the ongoing caseworker that she was no

longer in a relationship with the boyfriend and that he had moved out. According to the ongoing caseworker, "And then this police report, this incident informed me that he was some way, somehow involved and back in the home." Appellee learned through its investigation that the children witnessed the boyfriend inebriated on the stairs in Mother's home; E.T. used a baseball bat to attack the boyfriend in the home; and then after the police were called the boyfriend went outside and made a throwing motion to the bushes where the police eventually found a gun. Mother denied knowledge of the incident because she slept through it.

{¶ 9} The ongoing caseworker explained appellee's concern:

> She said that she had no idea that it happened, that she was asleep. And that she took a melatonin, and . . . she didn't wake up. And she basically said that she had no recollection of the event. And then when I asked her why she didn't tell me after she found out that it happened, she said that she was waiting for the next visit to tell me, which completely contradicts what our previous conversations were. So mom pretty much denies her involvement in it. I do have concerns about mom taking accountability. She tends to project and deflect, and she doesn't really understand, yes, it was my responsibility to make sure that I handled that situation. Yes, it was my responsibility to call 911. It was my responsibility to let Children Services know because I have an open case with them, especially for concerns of DV. But she didn't tell me. So that is mainly why we are here today.
>
> . . .
>
> I find it hard to believe that mother took a melatonin -- or what she reported to me, that she took a melatonin and she didn't wake up to it. I had multiple reports from the children that they were in her room trying to wake her up, and she did not wake up. So to me that's inconsistent with her taking a melatonin. I don't . . . know if mom reported to me the wrong medication, but she was very adamant in that [staffing] meeting, she was coherent, that she took a melatonin that night and that's why she didn't wake up. And so when I have children saying they were in the room and

banging on the door and trying to wake her up and shake her awake and she wouldn't wake up, that is cause for concern to me.

{¶ 10} Separately, the court-appointed guardian ad litem testified as to the results of her own investigation of the October 14 incident.

> I did watch the body cam footage of the incident and read numerous reports. And also I wanted to talk to the children first about the incident beforehand and mother in reports and -- I understand that she was asleep during the incident, and she said it was all [E.T.]. But my issue is not just [E.T.] but what lead to [E.T.] possibly being there. The man that's also been known as [Mother's boyfriend], the kids have been very vocal about him, and that he was mistreating their mom. That he baby-sat them at times. That he was mad at mom because she was always too tired to basically be social because she was working so much. They witnessed him being aggressive. [Child No. 2] expressed that he was not nice, especially to the boys. None of them -- I did ask all of them if he was ever physical to them. They reported that he was not. They reported that he was just mean to mom. And [child No. 2] specifically said he would never put hands on him because he would put hands back on him, so he didn't really mess with him.
>
> [Child No. 4] was very vocal about the night. She recalls being awake, and she recalls seeing the police. . . . [Child No. 4] has reported that she saw dad that night. And -- but it's unclear . . . what possible events unfolded because, I mean, I have one child explaining to me that dad was called to protect them from [Mother's boyfriend]. And then I have another recollection that just, you know, dad showed up. [Mother's boyfriend] was being mean. There's just been a lot of different versions of what happened. But, again, the reports -- [Mother] doesn't really have anything to acknowledge that it happened. No one answered the door that night. I recall reading that a child was seen in the window. It is unclear which child, if it was [Mother's young-adult child. K.E.] or maybe [child No. 2] or [child No. 3]. Someone called the police and said their mom . . . wouldn't wake up. So it was one of the children. And so . . . they saw something. They saw someone being hurt. And they also reported seeing mom being hurt by [Mother's boyfriend].

{¶ 11} The juvenile court described the significance of the October 14 incident:

"although Mother has engaged in domestic violence services, she does not understand her

6.

role in protecting the children from domestic violence (from [E.T.] or others) . . . [and] even if Mother was sleeping during the October 2024 incident, that also is concerning because the children could not wake Mother in an emergency."

{¶ 12} Consequently, effective on October 30, 2024, the juvenile court ordered at the emergency shelter care hearing that appellee receive interim temporary custody of the seven children, and then effective on December 12, the juvenile court, with Mother's consent, ordered appellee to receive temporary custody of them.

{¶ 13} Eventually, on May 2, 2025, appellee filed a motion for permanent custody of the children under R.C. 2151.413 and 2151.414, arguing that the children cannot be placed with Mother within a reasonable time or should not be placed with her under R.C. 2151.414(B)(1)(a), that the children have been in appellee's temporary custody for 12 out of the preceding 22 months under R.C. 2151.414(B)(1)(d); and that permanent custody is in the children's best interest under R.C. 2151.414(D). Appellee argued that Mother has continuously and repeatedly failed to remedy the conditions causing the children to be placed out of the home under R.C. 2151.414(E)(1), that the children have been removed from the family home twice since October 2023, under R.C. 2151.414(E)(16), and that "the children need a legally secure, permanent placement and the custodial history of the children indicates that permanent custody is in the best interest of the children," under R.C. 2151.414(D)(1).

{¶ 14} Appellee further argued that despite Mother's engagement with case plan services, her judgments about prioritizing the children's safety remained a concern. Child

7.

Nos. 1 and 2 were "whereabouts unknown" to appellee since October 2024, when Mother denied knowing their location and did not update appellee. Yet on April 24, 2025, child No. 1 "was located by the Toledo Police Department sleeping in his bed in Mother's home. On the same day, Mother brought Child-2 to LCCS." Child No. 1 "ran away from an emergency placement on April 25, 2025, and is whereabouts unknown again," while child No. 2 was placed in foster care.

{¶ 15} Appellee was also concerned about Mother's two young-adult children, one of whom, K.E., had a history for juvenile delinquency as well as an adult criminal history for assault and aggravated menacing, and had a mental health history of attempted suicide. K.E. continued to reside in Mother's home with the minor children. As described by the ongoing caseworker, although K.E.'s adult criminal charges were eventually dismissed, "They're violent in nature, and that's the biggest thing." The ongoing caseworker explained that since the children have already been exposed to violence in Mother's home through E.T. and Mother's boyfriend, the addition of Mother's young-adult children also potentially brought violence into Mother's home. "So when it was referenced to [K.E.] spending the night, what have you, all it takes is one night. And that's what I explained to mom multiple times. That's all it takes is for someone -- or something or her child to get hurt in a violent altercation between two adults."

{¶ 16} Appellee then decided, on June 11, 2025, that rather than seek permanent custody of child No. 1, it was in his best interest to seek legal custody and to place the

8.

17-year-old in a planned permanent living arrangement.[4] On that day appellee also filed a motion to amend its motion for permanent custody to remove child No. 1, which the trial court immediately granted.

{¶ 17} The two-day disposition trial for appellee's motion for permanent custody of child Nos. 2 through 7 and motion for legal custody of child No. 1 was held on July 28 and July 30, 2025. The juvenile court heard extensive testimony from two witnesses, appellee's ongoing caseworker and the court-appointed guardian ad litem, and admitted six exhibits into evidence. Both witnesses recommended the juvenile court grant appellee's motions. Mother did not testify.

{¶ 18} On September 12, 2025, the juvenile court granted both of appellee's motions and made the following relevant findings regarding child Nos. 2 through 7:

{¶ 19} Under R.C. 2151.414(B)(1)(a), the juvenile court found by clear and convincing evidence that child Nos. 2 through 7 "have not been abandoned or orphaned, have not been in the custody of a public children services agency or a private child placing agency for at least 12 months of a consecutive 22-month period, and cannot be placed with either parent within a reasonable time or should not be placed with either parent."

---

[4] Pursuant to Juv.R. 2(HH), a "planned permanent living arrangement" is where the juvenile court "gives legal custody of a child to [appellee] without the termination of parental rights" and "the order permits [appellee] to make an appropriate placement of the child and to enter into a written planned permanent living arrangement agreement with a foster care provider or with another person or agency with whom the child is placed."

9.

{¶ 20} Under R.C. 2151.414(E)(1), the juvenile court found by clear and convincing evidence that following the placement of child Nos. 2 through 7 outside of Mother's home and notwithstanding reasonable case planning and diligent efforts by appellee to assist Mother to remedy the problems that initially caused her children to be placed outside Mother's home, Mother has failed continuously and repeated to substantially remedy the conditions causing child Nos. 2 through 7 to be placed outside of Mother's home. The juvenile court explained:

> Mother has engaged in case plan services. However, these case plan services have not remedied the problems leading to the removal of the children. Mother initially appeared to have changed her behavior and appeared able to protect the children, and the children were reunified with her. Shortly after the children's reunification, a new incident of violence occurred in Mother's home between [E.T.] and Mother's boyfriend, which the children witnessed. Mother did not immediately report this incident to LCCS, and even Mother's own explanation of the incident (that she was sleeping and the children could not wake her up) raises concern that she has not internalized the lessons from her services about her responsibility to protect the children. Mother also continues to allow her adult daughter to reside in the home, despite the adult daughter's own history of violence and mental health symptoms that could endanger the minor children.

{¶ 21} Under R.C. 2151.414(E)(16), regarding any other factor the court considers relevant, the juvenile court found by clear and convincing evidence that "it is relevant that the children have been removed twice since October 2023, with the second removal occurring after an incident of violence in Mother's home between [E.T.] and Mother's boyfriend."

{¶ 22} Under R.C. 2151.414(B)(1)(d), the juvenile court found by clear and convincing evidence that child Nos. 2, 3, and 5 "have been in the temporary custody of

10.

LCCS for twelve or more months of a consecutive twenty-two-month period." Citing

R.C. 2151.413(D)(1) and *In re N.M.P.*, 2020-Ohio-1458, ¶ 23, the juvenile court

calculated each child's period of temporary custody with appellee as follows:

> [Child Nos. 2 through 7] entered LCCS' temporary custody on November 20, 2023. at the disposition hearing. Legal custody of [child Nos. 4, 6, and 7] was returned to Mother on June 26, 2024 (219 days later). Legal custody of [child Nos. 2 and 3] was returned to Mother on August 15; 2024 (269 days later). Legal custody of [child No. 5] was returned to Mother on October 2, 2024 (317 days later).
> On October 30, 2024, all the children. were removed again from Mother's custody and a Motion to Change Disposition was filed. [Child Nos. 2 through 7] re-entered LCCS' temporary custody on December 12, 2024, at the hearing on the Motion to Change Disposition.
> LCCS filed its Motion for Permanent Custody on May 2, 2025 -- 141 days after the children re-entered LCCS' temporary custody. At the time that LCCS filed its Motion for Permanent Custody, [child Nos. 4, 6, and 7] had been in LCCS' temporary custody for a total of 360 days, just under one year. [Child Nos. 2 and 3] had been in LCCS' temporary custody for a total 410 days at the time of the Motion for Permanent Custody, and [child No. 5] had been in LCCS' temporary custody for a total of 458 days.

{¶ 23} Under R.C. 2151.414(D), the juvenile court found by clear and convincing

evidence that a grant of permanent custody to appellee is in the best interests of child

Nos. 2 through 7.

{¶ 24} Under R.C. 2151.414(D)(1)(a), regarding the interaction and

interrelationship of the children with their parents, siblings, relatives, foster caregivers

and out-of-home providers, and any other person who may significantly affect the

children, the juvenile court determined by clear and convincing evidence that:

> [Child Nos. 2 through 7] all have a generally good relationship with Mother, who visits regularly, with no recent concerns during visits. . . . Five of these six children are now placed together in the same foster home. Most

11.

of the children were placed in this foster home during the first removal. Child No. 7 was not placed in this foster home during her first removal, and she is adjusting to the foster parents' home. The five children get along well with each other and with the foster parents and appear happy in the foster home. Child No. 5 is placed separately in a treatment foster home. He is extremely bonded to his foster parent, and he has made significant progress in addressing his mental health and behavioral issues in this foster home. The Guardian ad Litem noted that child No. 5's behavior can trigger his siblings and cause chaos.

{¶ 25} Under R.C. 2151.414(D)(1)(b), regarding the wishes of the children, as expressed through their guardian ad litem with due regard for the maturity of the children, the juvenile court determined that:

> During [the guardian ad litem's] most recent visits with the children, [child No. 2] said that he did not care what happened, and [child No. 3] said that she wanted to go home or remain in her foster home. [Child No. 5's] wishes were somewhat unclear to [the guardian ad litem], because she has not been able to connect with him well due to his behaviors. However, [child No. 5] did say he misses his family. [Child No. 6] would not discuss his wishes with [the guardian ad litem]. [Child No. 7] said she wanted to go home to Mother and remain with her siblings. [Child No. 4] told [the guardian ad litem] that she wanted to go home to Mother.

{¶ 26} Under R.C. 2151.414(D)(1)(c), regarding the custodial history of the children, the juvenile court determined by clear and convincing evidence that:

> As of July 2023, the children were staying with [E.T.]. It. does not appear that custody formally changed, but Mother consented to this arrangement. The children were removed from [E.T.'s] home in October 2023 and placed in LCCS custody. The children were then reunified with Mother in stages between late June 2024 and early October 2024. They were removed from Mother's custody again on October 30, 2024, and returned to the custody of LCCS. The children have remained in the custody of LCCS since that date.

12.

{¶ 27} Under R.C. 2151.414(D)(1)(d), regarding the children's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency, the juvenile court determined by clear and convincing evidence that:

> [Child Nos. 2 through 7] deserve permanency in an environment that offers them security, stability, and. consistency. However, at this time, and for the foreseeable future, [their] parents will not be able to provide a secure, stable and consistent environment for them. A search for relatives has been conducted by LCCS; however, those searches were unsuccessful.[5]
>
> A child should not be required to wait forever for their parents to alleviate the reasons for removal These children were initially removed in October 2023. Although they were reunified with Mother for a short, time, a new incident of violence occurred, leading to the children's second removal in October 2024. Mother clearly loves her children and has tried her best to reunify with them. However, despite Mother's completion of some case plan services, this Court cannot find that the children would be safe if reunified with her. . . . This Court finds that reunification cannot occur in a timely manner. Accordingly, this Court finds that a legally secure permanent placement cannot be achieved without a grant of permanent custody to LCCS.

{¶ 28} Under R.C. 2151.414(D)(1)(e), whether any of the factors in R.C. 2151.414(E)(7) to (11) apply in relation to the parents and child, the juvenile court determined by clear and convincing evidence that no such factors applied to Mother.

---

[5] Earlier, the juvenile court determined, "The LCCS family search and engagement department. searched for relatives for possible placement of the children. LCCS identified over 100 family members, but none of them were found to be appropriate. The paternal grandmother and paternal aunt of [E.T.'s] children were evaluated for placement, but their home studies were denied. LCCS conducted a home study on a Harbor clinician that knew [child No. 5] but this home study was also denied."

13.

{¶ 29} Mother timely appealed the juvenile court's decision with two assignments of error:

1. The trial court's finding pursuant to R.C. 2151.414(E)(l) that mother failed continuously and repeatedly to substantially remedy the conditions causing the children to be placed outside the children's home was not supported by clear and convincing evidence.

2. The trial court's finding pursuant to R.C. 2151.414(E)(l6) that the children's second removal here was a factor in its decision was not supported by clear and convincing evidence.

{¶ 30} Mother does not appeal the juvenile court's order granting legal custody of child No. 1 to appellee, which will remain undisturbed. Regarding child Nos. 2 through 7, we will address Mother's assignments of error together.

## II. Permanent Custody Determination

{¶ 31} We review the juvenile court's determination of permanent custody under either a sufficiency-of-the-evidence and/or a manifest-weight-of-the-evidence standard, depending on the nature of the arguments presented by the parties. *In re A.S.*, 2026-Ohio-244, ¶ 98 (6th Dist.), citing *In re Z.C.*, 2023-Ohio-4703, ¶ 11; *In re J.D.*, 2024-Ohio-282, ¶ 43 (6th Dist.). A sufficiency-of-the-evidence standard is distinctly different, both quantitatively and qualitatively, from a manifest-weight-of-the-evidence standard. *In re Z.C.* at ¶ 13. The former is a test of evidence adequacy while the latter is not a question of mathematics but depends on its effect in inducing belief. *Id.* Whether evidence is legally sufficient to sustain a verdict, or in this matter the juvenile court's decision on permanent

14.

custody, is a question of law. *Id.* We will affirm the juvenile court's decision when the evidence is legally sufficient to support the decision as a matter of law. *Id.*

{¶ 32} We find the gravamen of Mother's first assignment of error is that the juvenile court erred by reaching its decision to terminate Mother's parental rights to child Nos. 2 through 7 and grant appellee permanent custody of them without sufficient evidence: "This court should find that without more, the agency did not prove by clear and convincing evidence that mother failed repeatedly and continuously to remedy the situation which cause the removal." *See State ex rel. Whitt v. Harris*, 2019-Ohio-4113, ¶ 11. Similarly, we find that Mother's second assignment of error questions the sufficiency of the evidence to support the juvenile court's decision: "This court should find that a less than speedy report of malfeasance by the father of some of her children does not rise to the level of clear and convincing evidence that mother herself is incapable of caring for her children, or that she is was substantially culpable for either of the incidents which resulted in the removal of her children." Therefore, we review as a question of law whether the evidence in the record is legally sufficient to sustain the juvenile court's decision.

{¶ 33} Prior to granting appellee's motion for permanent custody of child Nos. 2 to 7., the juvenile court must make specific findings by clear and convincing evidence pursuant to R.C. 2151.414(B)(1). *In re A.M.*, 2020-Ohio-5102, ¶ 18. First, "that one or more of the conditions in R.C. 2151.414(B)(1)(a) through (e) applies." *Id.* Second, that

15.

the grant of permanent custody to appellee is in the best interest of the children. *Id.*, citing R.C. 2151.414(B)(1).

{¶ 34} "Clear and convincing evidence is that measure or degree of proof which is more than a mere 'preponderance of the evidence,' but not to the extent of such certainty as is required 'beyond a reasonable doubt' in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *Cross v. Ledford*, 161 Ohio St. 469, 471 (1954), paragraph three of the syllabus.

{¶ 35} For the first prong regarding permanent custody, the juvenile court determined by clear and convincing evidence that R.C. 2151.414(B)(1)(a) applied to Mother, which states:

> [T]he court may grant permanent custody of a child to a movant if the court determines . . . by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody of the child to the agency that filed the motion for permanent custody and that any of the following apply: (a) The child is not abandoned or orphaned, has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period . . . and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.

{¶ 36} Mother does not challenge the juvenile court's calculation of the periods of time during which appellee had temporary custody of her children such that she offers a different calculation. Rather, Mother argues for her first and second assignments of error that she was not the responsible party who left the children at the Detroit park in

16.

September 2023. Mother acknowledges that, "The sum total of mother's culpability as the first removal was having custody of the children and trusting [E.T.] to take them to a park and back." Mother then argues for the second removal that E.T. caused the disruption at her home. "She did not deny the incident occurred to LCCS, only that she had slept through it, and planned to report it to the caseworker at her next weekly visit with the children." Mother simply concludes that the foregoing does not "prove by clear and convincing evidence that mother failed repeatedly and continuously to remedy the situation which cause the removal . . . [because] mother was arguable not directly responsible for either of the removals." Importantly, Mother does not challenge the fact that she consented to each removal, where such consent undermines her sufficiency-of-the-evidence arguments.

{¶ 37} In response to both assignments of error, appellee argues that the juvenile court found that "although Mother engaged in case plan services, her behavior had not changed," citing *In re R.B.*, 2025-Ohio-1579, ¶ 103 (6th Dist.). While appellee initially thought Mother had changed and supported her reunification with the children, the "new incident of violence on October 2024, and Mother's response to it, persuaded the trial court that Mother's compliance with case plan services had not led to lasting behavioral change such that Mother unde4rstood her responsibility to protect the children." The fact the children were removed from Mother's home twice, each a traumatic event, was relevant to the juvenile court's decision. Appellee argued "the fact that the children were

17.

removed a second time just after reunification with Mother was incredibly relevant to a determination of whether they could or should be reunified with [her].”

{¶ 38} Where the juvenile court, as it did in this matter, determined the first prong regarding permanent custody pursuant to R.C. 2151.414(B)(1)(a), the juvenile court must also consider the presence of any R.C. 2151.414(E) factors that would indicate the children cannot be placed with Mother within a reasonable time or should not be placed with her. *In re T.G.*, 2023-Ohio-2576, ¶ 36 (6th Dist.).

{¶ 39} Here, the juvenile determined by clear and convincing evidence that R.C. 2151.414(E)(1), the subject of Mother's first assignment of error, and R.C. 2151.414(E)(16), the subject of Mother's second assignment of error, applied to Mother, but the juvenile court needed to only find one. *In re L.C.*, 2024-Ohio-283, ¶ 88 (6th Dist.). We find that the juvenile court's determinations were supported by clear and convincing evidence in the record under both R.C. 2151.414(E)(1) and 2151.414(E)(16). Although Mother engaged in case plan services, including domestic violence survivor's services, she failed to internalized the lessons from her services about her responsibility to protect the children from witnessing violence in her home on October 14, 2024. In addition, Mother failed to report the incident to appellee and continued to house her adult daughter K.E., who could expose the children to violence in Mother's home. The juvenile court found it was relevant that the children were twice removed from her care “since October 2023, with the second removal occurring after an incident of violence in Mother's home between [E.T.] and Mother's boyfriend.”

18.

**{¶ 40}** In order to satisfy the second prong regarding permanent custody, the juvenile court must consider "all relevant factors," including the nonexhaustive list under R.C. 2151.414(D)(1)(a) through (e). *In re A.M.*, 2020-Ohio-5102, at ¶ 19. "Consideration is all the statute requires." *Id.* at ¶ 31. We find the juvenile court satisfied the second prong by considering each of the R.C. 2151.414(D)(1)(a) through (e) factors. While child Nos. 2 through 7 had generally good relationships with Mother, five of them lived together in the same foster home and were doing very well there. Each child either expressed a wish to live with Mother or did not care or refused to express their wish. Each of the children was in appellee's temporary custody between 360 and 458 days, with child Nos. 2, 3, and 5 specifically found to be in appellee's temporary custody for 12 or more months of a consecutive 22-month period. The children needed legally secure and permanent placements that appellee could provide because, although Mother clearly loved her children and tried her best to reunify with them, the children continued to be exposed to violence in her home. The juvenile court acknowledged that no factors in R.C. 2151.414(E)(7) to (11) applied to Mother.

**{¶ 41}** Upon review we find that as a matter of law the evidence is legally sufficient to support the juvenile court's grant of appellee's motion for permanent custody of child Nos. 2 through 7. The juvenile court's determination was sufficiently supported by clear and convincing evidence in the record.

**{¶ 42}** Mother's first and second assignments of error are not well-taken.

19.

## III. Conclusion

The judgment of the Lucas County Court of Common Pleas, Juvenile Division, terminating Mother's parental rights to child Nos. 2 through 7 and granting permanent custody of the children to appellee is affirmed. Mother is ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Thomas J. Osowik, J.

_____
JUDGE

Christine E. Mayle, J.

Charles E. Sulek, J.
CONCUR.

_____
JUDGE

_____
JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at:
http://www.supremecourt.ohio.gov/ROD/docs/.